**SAN ANTONIO, TEXAS Acting By and Through Its CITY PUBLIC SERVICE BOARD, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Burlington Northern, Inc., et al., Intervenors.**

**STATE OF TEXAS, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Burlington Northern, Inc., et al., Intervenors.**

**BURLINGTON NORTHERN, INC., et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**City of San Antonio, Texas, et al., Intervenors.**

Nos. 78–2051, 78–2216, 78–2307.

United States Court of Appeals, District of Columbia Circuit.

30 June 1981.

R. Eden Martin, Washington, D. C., with whom Howard J. Trienens, Richard J. Metzger, Thomas W. Merrill, Chicago, Ill., and John Will Ongman, Washington, D. C., for Railroad Petitioners, were on the Petition for Clarification of Mandate.

William L. Slover, C. Michael Loftus and John H. LeSeur, Washington, D. C., were on the response to Petition for Clarification of Mandate for petitioner San Antonio, Texas.

Richard A. Allen, Kathleen M. Dollar, and Evelyn G. Kitay, Interstate Commerce Commission, Washington, D. C., were on the response to Petition for Clarification of Mandate for respondent Interstate Commerce Commission.

Before ROBB, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

On 9 June 1980 this court vacated an order of the Interstate Commerce Commission.[1] The railroads party to the case now seek clarification of the legal effect of our ruling in a "petition for clarification of mandate."

Ultimately at issue in this litigation is the rate to be charged for shipment of coal by unit-train from Cordero Junction, Wyoming, to Elmendorf, Texas, a suburb of San Antonio. The facts and history of the case already have been set out at length in our opinion and those of the ICC; we will not repeat them here beyond the barest of summaries.

The critical events, in chronological order, are as follows:

(1) On 14 October 1976 the ICC prescribed a maximum reasonable rate of $10.93 per ton.[2] The ICC's order contained no expiration date, but was to "continue in full force and effect until the further order of the Commission."[3] This order has become known as *San Antonio I.*

(2) At the request of the railroads, the ICC reopened its proceedings, ultimately issuing two further orders,[4] now known as *San Antonio II* and *San Antonio III*, in which the rate ceiling was raised, first to $16.12 per ton and then to $17.23 per ton. Under the authority of these orders the railroads filed tariffs setting rates above the *San Antonio I* rate ceiling.

(3) Then, the City of San Antonio, the State of Texas, the United States Department of Energy, and the railroads all petitioned this court for review of

---

1. *San Antonio, Texas v. United States*, 631 F.2d 831 (D.C.Cir.1980).

2. *San Antonio, Texas v. Burlington Northern, Inc.*, 355 I.C.C. 405 (1976), *aff'd*, 555 F.2d 637 (8th Cir. 1977).

3. *Id.* at 418.

4. *San Antonio, Texas v. Burlington Northern, Inc.*, 359 I.C.C. 1 (1978); *San Antonio, Texas v. Burlington Northern, Inc.*, 361 I.C.C. 482 (1979).

the ICC's *San Antonio II* and *San Antonio III* orders. We vacated the orders and remanded the case to the Commission for proceedings not inconsistent with our opinion.[5]

At issue now is whether our ruling vacating the *San Antonio II* and *San Antonio III* orders has the effect of rendering unlawful tariff rates above the *San Antonio I* ceiling filed by the railroads under the authority of the vacated orders.

The City of San Antonio takes the position that the effect of our decision vacating the Commission's orders is to restore the situation to the *status quo* before the vacated orders were issued. Because the *San Antonio II* and *San Antonio III* orders have been vacated, they argue, the *San Antonio I* order has sprung back to life "continu[ing] in full force and effect until the further order of the Commission."[6] The railroads thus are now permitted to charge only rates at or below the maximum prescribed rate set in *San Antonio I*.

The railroads, on the other hand, argue that they are still free to charge the rates set by their published tariffs filed under the authority of the now-vacated ICC orders. The ICC, after siding with the City of San Antonio, has reversed its position and endorsed that of the railroads.[7]

The railroads, now joined by the Commission itself, are in error. The intent and effect of our decision vacating the ICC's orders in *San Antonio II* and *San Antonio III* was to do just what we said: to vacate those orders. Nothing more was intended, expressly indicated, or implicitly suggested.

In the present case, the *status quo* prior to the *San Antonio II* and *San Antonio III* orders is determined by the Commission's order in *San Antonio I*. The *San Antonio I* order was superseded for a time by the Commission's *San Antonio II* and *San Antonio III* orders, but with those orders vacat-ed, *San Antonio I* did continue in force pending further ICC action.

In the wake of our ruling, of course, the railroads have been and are free to petition the ICC to amend temporarily the *San Antonio I* maximum rate prescription; such action by the ICC could permit the railroads to publish tariffs in excess of the *San Antonio I* limit. Should the ICC ultimately determine that the tariffs published are too high, reparations could be made available to the affected shippers. In the absence of ICC action, however, the *San Antonio I* order has remained in effect. Tariffs in excess of it have been therefore unlawful.

Even had we wished to do so we could not have achieved the result the railroads now seek. That should be more plain than ever after the Supreme Court's decision this Term in *Consolidated Rail Corp. v. National Association of Recycling Industries, Inc. (Consolidated Rail)*,[8] if it was not clear enough after the Court's earlier decision in *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade (Atchison, Topeka)*.[9] For while this court has the authority to set aside an ICC action found to be without justification in the record, the Supreme Court has made it crystal clear that we are without authority to determine interim transportation policy pending further ICC action after a decision of this court vacating an ICC order. Except in unusual circumstances, our authority is at an end once we set aside an ICC order under review.

In *Consolidated Rail*, for example, this court vacated an ICC order setting the maximum reasonable rate for transportation of recyclables. We then purported to revoke rate increases that the railroads had filed under the umbrella of the vacated Commission order. No other outstanding ICC order, however, prevented the railroads

---

*San Antonio, Texas v. United States*, 631 F.2d 831 (D.C.Cir.1980).

355 I.C.C. at 418.

*San Antonio, Texas v. Burlington Northern, Inc.*, 364 I.C.C. 887 (1981).

449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981).

412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

from filing the higher rates; instead, we took affirmative action on our own to order that the rates be rescinded. In so doing we attempted to do more than merely restore the *status quo ante.* The Supreme Court reversed us, ruling that this court lacks the authority to take affirmative actions of its own to set interim transportation policy. As the Court said: "The authority to determine when any particular rate should be implemented is a matter which Congress has placed squarely in the hands of the Commission." [10]

In *Consolidated Rail* the Supreme Court relied in part on its earlier decision in *Atchison, Topeka.* In that case, the ICC had approved tariffs filed by the railroads. The reviewing court, finding no adequate explanation for an apparent deviation by the ICC from its own precedent, vacated the ICC order. The court purported to suspend the rates filed by the railroads pending further ICC proceedings on remand. As in *Consolidated Rail,* the Supreme Court in *Atchison, Topeka* reversed the reviewing court's suspension of the railroads' tariffs, because the vacation of the ICC order alone did not have the effect of suspending the railroads' tariffs, so that a separate injunction not authorized by statute was necessary to accomplish that end. As the Court said:

> [A]n injunction forbidding the railroads to implement a proposed change in rates is not, strictly speaking, an injunction suspending the Commission's order. . . . The only consequence of suspending that order is that the railroads may not rely, in some subsequent proceeding, on a Commission finding that the proposed rates were just and reasonable. In an action for reparations, for example, the

railroads could not gain any benefit from the purported Commission approval of the increases. The Commission's order also provided that the proceedings be discontinued, and suspension of the order requires the Commission to reopen its inquiry.

> *Carriers may put into effect any rate that the Commission has not declared unreasonable.* Suspension of the Commission's order thus does not in itself preclude the carriers from implementing a new rate.[11]

The Supreme Court has thus made clear that, except in extraordinary circumstances, reviewing courts do not have the authority to determine interim policy pending new Commission action after the vacation of a Commission order.[12]

In the case before us, then, this court has had only the authority to vacate the ICC orders in *San Antonio II* and *III.* Because the vacation of those orders revived the ICC's own *San Antonio I* order, our decision has had the practical effect of rendering unlawful the railroads' tariffs filed under the umbrella of the vacated *San Antonio II* and *III* orders. Had we wished to permit the railroads to maintain their tariffs after we vacated the *San Antonio II* and *III* orders, we would have had somehow to strike down the *San Antonio I* order, which was still outstanding and *not* before us for review. This we did not have the power to do.

The Commission, of course, has been, and is, in a position to take whatever action consistent with the statute it considers appropriate with respect to the rates to be charged by the railroads. And the railroads have been and remain free to petition the

---

**10.** 101 S.Ct. at 777.

**11.** 412 U.S. at 818–19, 93 S.Ct. at 2380–81 (emphasis added) (citations omitted).

**12.** To be sure, in *Consolidated Rail* and in *Atchison, Topeka* the Court's vacation of the Commission's orders had the practical effect of enabling the railroads to continue with their already-filed tariffs; no outstanding Commis-

sion order prevented them from so doing. In the present case, on the other hand, the effect of our vacation of the Commission's orders has been to subject the railroads to the consequences of an earlier Commission finding that the higher tariffs are unreasonable. This difference in practical effect, however, is not the result of some action by this court, but the consequence of a preexisting ICC order forbidding higher tariffs.

Commission to take such action on their behalf as they deem appropriate. Suitable interim action which would protect the interests of the railroads has been and is available to the Commission, if not to this court. The railroads should seek relief where it can be granted—at the ICC, not this court. In this regard, we note that since this case was decided, the Commission has vacated the *San Antonio I* rate prescription, effective 7 May 1981.[13] The matter is now entirely in the hands of the Commission free of the orders in *San Antonio I, II,* and *III.*

---

**13.** *San Antonio, Texas v. Burlington Northern, Inc.,* 364 I.C.C. 887 (1981).