# BURLINGTON NORTHERN INC. ET AL. *v.* UNITED STATES ET AL.

No. 81–1008.   Argued November 3, 1982—Decided December 13, 1982

BURGER, C. J., delivered the opinion for a unanimous Court.

*R. Eden Martin* argued the cause for petitioners. With him on the briefs were *Howard J. Trienens* and *Thormund A. Miller.*

*Elliott Schulder* argued the cause for the federal respondents. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Shapiro, John Broadley, Kathleen M. Dollar, Robert S. Burk,* and *Timm L. Abendroth. William L. Slover* argued the cause for respondents City of San Antonio et al. With him on the brief for respondent San Antonio was *C. Michael Loftus. Mark White,* Attorney General, *John W. Fainter,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *James R. Myers* and *Stuart Fryer,* Assistant Attorneys General, filed a brief for respondent State of Texas.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to clarify the allocation of authority, as between the federal courts and the Interstate Commerce Commission, to set and review rates for movements of coal by rail.

## I

This case arose as a result of a 1972 decision of San Antonio, Tex., acting through its City Public Service Board, to substitute coal-generated electricity for natural gas. Toward that end, in 1974, San Antonio entered into long-term contracts to purchase coal from two suppliers in Campbell County, Wyo.; began to construct two coal-fired generating units; and initiated negotiations with Burlington Northern Inc. and Southern Pacific Transportation Co. for contracts to transport coal from Wyoming to the new plants. Although the railroads originally quoted San Antonio a rate of $7.90 per ton for moving coal from Campbell County to San Antonio, economic conditions, which were characterized by rapid inflation, required the railroads to raise the rate to $11.90 per ton. In May 1975, San Antonio filed a complaint with the Interstate Commerce Commission seeking prescription of a just and reasonable tariff.

In October 1976, the Commission rendered a decision, *San Antonio* v. *Burlington Northern, Inc.*, 355 I. C. C. 405 (1976) *(San Antonio I)*, establishing a rate of $10.93 per ton for the San Antonio movement. The Commission emphasized that the prescription was temporary by noting: "The public interest requires that, in view of the parties' inability to reach an agreement, a rate be prescribed at this time so that the movement may commence. As actual experience is gained, the parties may petition for modification of the prescription if circumstances warrant." *Id.*, at 417–418. The order was to "continue in full force and effect until the further order of the Commission." *Ibid.*

134

The railroads sought review in the United States Court of Appeals for the Eighth Circuit, claiming, *inter alia*, that the Commission had erred in not considering the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94–210, 90 Stat. 31 (4–R Act),[1] which became effective before *San Antonio I* was announced. The Court of Appeals affirmed the Commission, reasoning that since the rate was temporary and expressly subject to modification, the parties could return to the Commission when guidelines for implementing the 4–R Act were promulgated, *Burlington Northern, Inc.* v. *United States,* 555 F. 2d 637, 648 (1977).

In June 1977, after six months of operation at the *San Antonio I* rates, the railroads petitioned the Commission for a modification of the rate. In October 1977, the Commission reopened the San Antonio proceeding, and one year later, issued a new order, *San Antonio* v. *Burlington Northern, Inc.,* 359 I. C. C. 1 (1978) *(San Antonio II),* finding that when compared to other similar movements, the *San Antonio I* $10.93 rate was "below a maximum reasonable rate and that modification of that rate [was] warranted." 359 I. C. C., at 7. After making extensive new cost findings and applying the ratemaking guidelines of the 4–R Act, the Commission set the maximum rate level at $16.12 per ton.

Both San Antonio and the railroads were dissatisfied with this rate and petitioned for reconsideration. In June 1979, a third order was issued, *San Antonio* v. *Burlington Northern, Inc.,* 361 I. C. C. 482 (1979) *(San Antonio III),* which made certain modifications in the *San Antonio II* analysis that resulted in a new maximum rate of $17.23 per ton for the San

---

[1] The 4–R Act changed the regulatory atmosphere in several key respects. Especially relevant here is § 205, which, as codified at 49 U. S. C. § 10704(a)(2) (1976 ed., Supp. IV), instructs the Commission to "make an adequate and continuing effort to assist . . . carriers in attaining revenue levels" that are "adequate, under honest, economical and efficient management, to cover total operating expenses . . . plus a reasonable and economic profit or return (or both) on capital employed in the business."

Antonio movement. The railroads then filed tariffs at the $17.23 rate.

Petitions for review of the *San Antonio II* and *San Antonio III* prescriptions were filed in the United States Court of Appeals for the District of Columbia Circuit by all the parties. Without expressing an opinion as to whether the rate was too high, as San Antonio claimed, or too low, as the railroads urged, in June 1980, the Court of Appeals decided that aspects of both the *San Antonio II* and the *San Antonio III* rate orders were "arbitrary and capricious" and without "defensible rationale." *San Antonio* v. *United States*, 203 U. S. App. D. C. 249, 269, 631 F. 2d 831, 851. The Commission's orders were vacated, and the case was remanded to the Commission.

It is at this point that the present controversy arose, for the parties sharply disagreed about the effect of the Court of Appeals' decision on the filed tariffs pending the Commission's decision on remand. Construing the decision as vacating only the Commission's orders in *San Antonio II* and *III* but not the rates that were filed, the railroads continued to treat the $17.23 rate as the one which San Antonio was required to pay pursuant to 49 U. S. C. § 10761 (1976 ed., Supp. IV). San Antonio, on the other hand, interpreted the Court of Appeals' decision as vacating the $17.23 rate and reviving the rate set by *San Antonio I*. Accordingly, the shipper unilaterally reduced its payments to the $10.93-per-ton rate set in 1976.[2]

Although we might have thought otherwise, it was not clear to the railroads what legal action should be taken to force San Antonio to pay the filed $17.23 tariff. Several maneuvers were attempted: in its first effort to reestablish *San Antonio III* as the rate applicable to this period, the carriers

---

[2] For convenience, we continue to refer to the rates as "*San Antonio I*," "*San Antonio II*," and "*San Antonio III*." In actual fact, general rate increases, which are not in issue here, have taken effect significantly raising each of these rates. See Brief for Petitioners 9, n. 3.

filed a new tariff in early November 1980. That tariff, which would have required San Antonio to prepay at the $17.23 rate before coal service would be provided, was suspended by a division of the Commission which agreed with San Antonio that the Court of Appeals' decision precluded any rate except $10.93.

The railroads asked the Court of Appeals for clarification of its decision.[3] Pending review, however, the parties carried on their controversy in other forums. The railroads again attempted to file a tariff in conformity with *San Antonio III*. Although this time the tariff was not suspended or rejected by the Commission, San Antonio continued to pay at the *San Antonio I* rate even after the new tariff's December 1980 effective date; in addition, it filed a complaint to enforce the *San Antonio I* rate in the United States District Court for the Western District of Texas. Before the District Court could rule, the railroads countered by filing a petition asking the Commission to clarify its refusal to suspend or reject the new tariff by declaring that this action amounted to a modification of *San Antonio I*. In addition, the carriers filed a second prepayment tariff—which was also accepted by the Commission. Before the Commission could react to the railroads' request for clarification, however, the Texas District Court ruled in San Antonio's favor on an application to preliminarily enjoin the railroads from conditioning service on prepayment of rates that did not conform with *San Antonio I*. The railroads appealed to the Court of Appeals for the Fifth Circuit.

In April 1981, while the railroads' appeal was pending in the Fifth Circuit, the Commission finally took the step neces-

---

[3] Initially, the Commission took the position adopted by the panel, namely that the Court of Appeals' decision required the railroads to charge at *San Antonio I* rates. While the petition for clarification was pending, however, our decision in *Consolidated Rail Corp. v. National Assn. of Recycling Industries, Inc.*, 449 U. S. 609 (1981) *(per curiam)*, was handed down. At about this time, the Commission revised its view to espouse the railroads' position. The Federal Government has thus joined the railroads in asking us to overturn the decision of the Court of Appeals.

sary to end the controversy over what rate applied from the time of the June 1980 decision of the Court of Appeals for the District of Columbia Circuit. In the context of considering the railroads' request for clarification, the Commission formally vacated its *San Antonio I* prescription. The order stated that in a later proceeding, the Commission would determine "what the maximum reasonable rate should have been . . . for the period during which the vacated maximum rate prescriptions in *San Antonio II* and *III* were in effect." *San Antonio* v. *Burlington Northern, Inc.*, 364 I. C. C. 887, 894 (1981) *(San Antonio IV)*. Pursuant to 49 U. S. C. § 10327(h) (1976 ed., Supp. IV), this order became effective 30 days later, in May 1981.

It was at this point that the Fifth Circuit decided the railroads' appeal of the Texas District Court decision. In its holding, that court vacated the preliminary injunction on the ground that only the Commission had jurisdiction to enjoin railroads from collecting their filed tariff rate. In addition, that court denied an application by San Antonio for a stay of the Commission's *San Antonio IV* decision, *San Antonio* v. *Burlington Northern, Inc.*, 650 F. 2d 49, clarified, 652 F. 2d 422 (1981). Thus, when the Commission's *San Antonio IV* decision became effective in May 1981, San Antonio finally began to pay for the shipment of its coal at the carriers' tariff rate of $17.23 per ton.[4]

One month later, on June 30, 1981, the Court of Appeals for the District of Columbia Circuit issued the clarification of its 1980 holding. 211 U. S. App. D. C. 111, 655 F. 2d 1341. It is this clarification that is under review here. Citing *Consolidated Rail Corp.* v. *National Assn. of Recycling Industries, Inc.*, 449 U. S. 609 (1981) *(per curiam)*, and *Atchison,*

---

[4] In the period in dispute, from June 1980, when the Court of Appeals vacated the *San Antonio II* and *III* orders, to May 1981, when the Commission formally vacated the *San Antonio I* prescription, San Antonio's failure to pay the tariff rate resulted in a savings to it—and a loss to the railroads—of over $19 million. See Brief for Federal Respondents 6.

*T. & S. F. R. Co.* v. *Wichita Board of Trade*, 412 U. S. 800 (1973), the Court of Appeals held that since it was without authority to determine interim policy pending remand proceedings in the Commission, the effect of the court's 1980 decision was necessarily to reinstate *San Antonio I*, which was "revived" by the vacation of *San Antonio II* and *III*. 211 U. S. App. D. C., at 114, 655 F. 2d, at 1344. Tariffs set in excess of the *San Antonio I* rate were therefore declared "unlawful" for the period after the court vacated *San Antonio II* and *III* but before the Commission formally vacated *San Antonio I*. 211 U. S. App. D. C., at 113, 655 F. 2d, at 1343. We granted certiorari. 455 U. S. 988 (1982).[5]

We agree that *Consolidated Rail* and *Wichita Board of Trade* control this case, but these holdings require federal courts to defer to the Commission on questions concerning the applicable rates; accordingly, we reverse.

## II

In recent years, we have had four occasions to consider federal courts' authority to alter rail rates regulated by the Interstate Commerce Act. In the first of these, *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658 (1963), a railroad faced with declining revenues had attempted to lower its rates, and the issue before us was whether a Federal District Court had the power to enjoin this reduction at the request of competitors of the railroad and those who shipped by rail. Affirming the District Court's denial of an injunction, we held that Congress, in the Interstate Commerce Act, meant to "vest in the Commission the sole and exclusive power to suspend" the rates. *Id.*, at 667.

---

[5] San Antonio argues that the railroads' failure to petition for certiorari within 90 days after rehearing was denied on the June 1980 judgment deprives this Court of jurisdiction. Because the June 1981 decision "resolve[d] a genuine ambiguity in a judgment previously rendered" and dealt with a question which was not "plainly and properly settled with finality," *FTC* v. *Minneapolis-Honeywell Regulator Co.*, 344 U. S. 206, 211–212 (1952) (footnote omitted), we plainly have jurisdiction.

We noted several reasons for this rule. First, a review of the legislative history of the 1910 amendments to the Interstate Commerce Act demonstrated that Congress was dissatisfied with the nonuniformity in rates and inequities that resulted from the 1887 Interstate Commerce Act's failure to give the Commission power to grant injunctive relief. We noted that the authority to suspend rates granted the Commission by the 1910 amendments would not cure the problem unless the suspension power was exclusive. *Id.*, at 664.

Second, we held that court-ordered injunctive relief would interfere with the careful way in which the Commission's suspension power takes into account the need of the carrier to receive a reasonable rate of return, and the desire of the shipper to pay only what is lawful. Unlike an injunction, a suspension order is limited to seven months' duration. *Id.*, at 665–666. The shippers, on the other hand, are fully protected by the reparation provision which requires carriers to reimburse shippers if the Commission later determines that the filed tariff was unreasonable. *Id.*, at 666.

Finally, we emphasized that court-ordered injunctions were inconsistent with the congressional intent to vest rate-making decisions in the Commission, stating:

"Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction." *Id.*, at 668. (Emphasis in original.)

Ten years later, we again considered a federal court's power to enjoin rail rates in *United States* v. *SCRAP*, 412 U. S. 669 (1973). There we reversed a three-judge District Court that had enjoined the Commission from permitting surcharges on shipments of recycled goods. We rejected the argument that injunctive relief could be granted under authority conferred by the National Environmental Policy Act, 42 U. S. C. § 4331 *et seq.*, stating that "to grant an injunction in the present context, *even though not based upon a substan-*

*tive consideration of the rates,* would directly interfere with the Commission's decision as to *when* the rates were to go into effect, and would ignore our conclusion in *Arrow.* . . ." 412 U. S., at 697. (First emphasis added; other in original.)

A third case, *Wichita Board of Trade, supra,* stated our position in even stronger terms. There the Commission had approved certain rate increases but failed, in the District Court's view, to explain its reasoning adequately. In addition to vacating the order and remanding the case for reconsideration by the Commission, the District Court enjoined the railroads from charging the rates that had been approved in the order. Although we affirmed the remand to the Commission, we nevertheless reversed as to the injunction, reiterating the views we expressed in *Arrow* that a federal court has no jurisdiction to enter an order that operates to fix rates.

> "The only consequence of suspending [an] order is that the railroads may not rely, in some subsequent proceeding, on a Commission finding that the proposed rates were just and reasonable. . . .
>
> "Carriers may put into effect any rate that the Commission has not declared unreasonable. . . . *Suspension of the Commission's order thus does not in itself preclude the carriers from implementing a new rate.*" 412 U. S., at 818–819. (Emphasis added.)

Again we noted that Congress channeled all rate decisions to the Commission in the first instance, *id.,* at 820; that court-ordered relief interferes with the delicate balance the Act strikes between the competing interests of shipper and carrier, *ibid.;* and that the equities favor allowing the railroads to charge more than the Commission may ultimately find reasonable because the Act gives the shippers a right to reparations while no such protection is given to the carriers, *id.,* at 823.

We now turn to our recent holding in *Consolidated Rail, supra,* which both parties appear to concede states the con-

trolling law. There the Commission fixed rates for recycled materials. On review, the Court of Appeals revoked the rate increases, remanded to the Commission to determine a rate structure incorporating the standards set forth in the 4–R Act, and enjoined new rates until after the Commission's reconsideration. In reversing this holding summarily, we held:

> "The authority to determine *when* any particular rate should be implemented is a matter which Congress has placed squarely in the hands of the Commission. *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658, 662–672 (1963). . . . [T]here is no basis in our prior decisions for the revocation order or for the injunction against further increases. 'If a reviewing court cannot discern [the Commission's] policies, it may remand the case to the agency for clarification and further justification. . . . When a case is remanded on the ground that the agency's policies are unclear, an injunction ordinarily interferes with the primary jurisdiction of the Commission.' *Atchison, T. & S. F. R. Co.* v. *Wichita Board of Trade*, 412 U. S. 800, 822 (1973). . . ." 449 U. S., at 612. (Emphasis added.)

To recapitulate, our cases stand for three propositions: (1) under the Interstate Commerce Act, primary jurisdiction to determine the reasonableness of rates lies with the Commission, see also *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 384 (1932); (2) federal-court authority to reject Commission rate orders for whatever reason extends to the orders alone, and not to the rates themselves, cf. 28 U. S. C. § 2349(a) ("The court of appeals . . . has exclusive jurisdiction to make . . . a judgment determining the validity of, and enjoining; . . . the *order* of the agency") (emphasis added); (3) where there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the Commission, since under the Act, the shipper may receive reparations for overpayment while the carrier

can never be made whole after underpayment. 49 U. S. C. § 11705(b)(3) (1976 ed., Supp. IV).[6]  Cf. *Atlantic Coast Line R. Co.* v. *Florida,* 295 U. S. 301 (1935).

## III

We can discern no basis to distinguish this case from *Arrow, SCRAP, Wichita Board of Trade,* and *Consolidated Rail, supra.*  By entering an order declaring that the *San Antonio I* rate order was "revived" for the period June 1980–May 1981, the Court of Appeals did that which we have said a federal court may not do: *i. e.,* freeze the rate that railroads charge shippers prior to a decision by the Commission as to what a reasonable rate should be.  That approach undermines the Commission's ability to exercise the primary jurisdiction delegated to it by Congress to insure equitable and uniform rates.  More important, the determination requires the railroads to accept a return that was considered temporary when it was approved in 1976, and "below a maximum reasonable rate" when it was modified in 1978.  This result would be inequitable in the best of times, but the impact is particularly acute in a period of high inflation and changing regulatory standards.[7]

Because the reparations provisions do not apply to both shippers and carriers, losses suffered by the carriers cannot be recovered.  Carriers are not adequately protected by their authority under §§ 10761 and 10762 to file a new rate or their right under § 10327(g) to petition the Commission to

---

[6] Under § 207(d)(2) of the Staggers Rail Act of 1980, Pub. L. 96–448, 94 Stat. 1907, 49 U. S. C. § 10707(d)(2) (1976 ed., Supp. IV), the carrier can also receive reparations.  This right is limited, however, to underpayments resulting from the *Commission's* suspension of a tariff; it does not apply where, as here, a *court* has prevented the carrier from collecting a higher tariff.

[7] See, *e. g.,* 4–R Act, discussed in n. 1, *supra;* Staggers Rail Act of 1980, Pub. L. 96–448, 94 Stat. 1895, *supra.*  Both statutes are directly relevant in the determination of a reasonable rate for the San Antonio coal movement; neither was considered in *San Antonio I.*.

modify its "revived" rate order, as San Antonio urges.   It is arguable—and in other proceedings, San Antonio has so claimed, see Brief for Petitioners 38–39—that before either action can take effect, the party adversely affected may ask for a hearing pursuant to *Arizona Grocery, supra.*   A plenary hearing necessarily causes delay, and even if it did not, action by the Commission usually will not be effective until 30 days have elapsed after its order is served, § 10327(h).

The claim is made that the Court of Appeals was powerless to achieve a different result because, under § 10704(a)(1), the only rate the railroads could legally charge was the rate prescribed by the Commission.   Since the Commission prescribed a rate in *San Antonio I*, the argument is that this is the rate the railroads must charge.   We disagree.   *San Antonio I* was by its terms limited to "continue in full force and effect until . . . further order of the Commission," 355 I. C. C., at 418.   Absent a contrary indication from the Commission, *San Antonio II* terminated the vitality of *San Antonio I*.[8]

Moreover, if the court was unsure about the continued vitality of *San Antonio I*, the more appropriate course would have been to remand to the Commission for explanation rather than to undertake itself to construe the order, and in so doing to interfere with the Commission's primary jurisdiction, contrary to important congressional policies.[9]

---

[8] San Antonio makes much of the dictionary definitions of "modify" and "vacate."   While ordinary meanings are not insignificant in statutory construction, San Antonio has not cited a single case under the Interstate Commerce Act making this distinction.

[9] Another way in which the Court of Appeals might have minimized interference with congressional objectives would have been to construe its own opinion as vacating only the Commission's new rate calculations and not the Commission's conclusion that the *San Antonio I* rate was too low. See 28 U. S. C. § 2349(a), allowing the court to enjoin or set aside "in whole or part, the order of the agency."   Cf. *Atchison, T. & S. F. R. Co.* v. *Wichita Board of Trade,* 412 U. S. 800, 822 (1973).

The existence of a 1976 rate prescription does not require a result different from the result reached in *Consolidated Rail*. *San Antonio II* and *III* each in turn vacated the prescription which preceded it. In striking the orders in *San Antonio II* and *III*, the court's action operated to leave in effect the rates filed under the Commission's authority pending the Commission's redetermination of a reasonable rate and subject always to reparations to protect the shipper should the Commission find that these rates were too high.[10]

The June 30, 1981, judgment of the Court of Appeals is

*Reversed.*

---

[10] Because we find that *Consolidated Rail* mandates this result, we need not reach the railroads' claim that the decision of the Court of Appeals is inconsistent with the filed rate doctrine.