**UTAH POWER & LIGHT COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Denver and Rio Grande Western Railroad Co., et al., Utah Division of Public Utilities, Intervenors.**

**No. 83-1276.**

United States Court of Appeals, District of Columbia Circuit.

June 14, 1985.

---

Ginsburg, Circuit Judge, filed concurring opinion.

Michael F. McBride and Mindy A. Buren, Washington, D.C., were on the Petition for Rehearing and Suggestion for Rehearing En Banc.

Before GINSBURG, Circuit Judge, Mac-KINNON and WILKEY, Senior Circuit Judges.

MacKINNON, Senior Circuit Judge: *

■ The central theme of Utah Power's Petition for Rehearing is that the decision of the Interstate Commerce Commission ("ICC"), reversing the Utah Commission, violated the intent of Congress as expressed in the Staggers Act by denying the state regulatory agency a "meaningful role ... with respect to regulation of intrastate rail rates." However, the petitioner here refuses to recognize the clear requirements that the Staggers Act imposes upon state commissions to follow federal standards. Petitioner misreads and mischaracterizes the ICC decision and the decision of this and other courts, and utterly fails to recognize that as petitioner it bears the burden of proving that the "appropriate rate" determined by the ICC exceeds a reasonable maximum. Such conduct by a state commission does not comply with any acceptable, "meaningful role" envisioned by the Staggers Act.

To overcome long standing and widespread favoritism for local shippers by state authorities, the Staggers Act in 1980 enacted revolutionary changes in the regulatory authority of state agencies over *intrastate* rail rates. First, it provided that "a State authority may *only* exercise jurisdiction over *intrastate* transportation provided by a rail carrier ... subject to [ICC]

---

* Senior Circuit Judge Wilkey did not participate in the resolution of the petition to the panel for rehearing. Circuit Judge Ginsburg has filed a separate statement concurring in the order denying rehearing.

... jurisdiction ... if such State authority exercises such jurisdiction *exclusively in accordance with the [Staggers Act]*." 49 U.S.C. § 11501(b)(1) (emphasis added). This requires state agencies to comply with federal standards.

Second, the Staggers Act substantially reduced the prior authority of state agencies by specifically denying them "any jurisdiction" over "general rate increases ... inflation-based rate increases ... or fuel adjustment surcharges approved by the [ICC]." 49 U.S.C. § 11501(b)(6).

Third, the Act expressly provided for the supremacy of certain federal action:

Action of the [Interstate Commerce] Commission under this section [11501] *supersedes* State law or action taken under State law in conflict with the action of the [ICC].

49 U.S.C. § 11501(f) (emphasis added). Section 11501 provides a clear declaration of federal supremacy over intrastate transportation in major areas of regulation that previously recognized as being within the jurisdiction of the state commissions.

In setting the intrastate rate in this proceeding, the Utah Commission refused to comply with applicable federal standards as set by the ICC. It is this disdain of the Utah Commission and Utah Power for compliance with mandatory federal standards that is fatal to their claims for the validity of the *intrastate* rate set by the Utah Commission. We accordingly affirmed the decision of the ICC, subject to several stated limitations, and remanded the case for further limited review of the evidentiary support on several points that do not appear to materially affect the reasonableness of the rate. 747 F.2d 721.

(1) *The Role of the State Commissions in Setting Intrastate Rates.* Petitioner questions the role under the Staggers Act that the ICC assigns to state regulatory agencies in regulating intrastate rail rates where the state authority and its procedures have been certified [provisionally] by the ICC under section 214 of the Act. 94 Stat. 1913. Utah Power asserts that the decisions of the ICC, and of this court in

this case, are contrary to congressional intent and relegate state agencies to a "virtually meaningless" role in regulating intrastate rail rates. Petitioner claims two decisions in the Sixth and Seventh Circuits support its contention.

First, petitioner cites *Kentucky Utilities Co. v. ICC*, 721 F.2d 537 (6th Cir.1983). In this case the Kentucky Railroad Commission set intrastate rates in accordance with a "ton/ton mile formulation." Since the Kentucky Commission *adhered* to the federal standards and set a rate "not shown to be inconsistent with the Staggers Act," the court upheld the action of the state agency and ordered the rate "reinstated after the ICC had set it aside." The court held that the rates were valid because they "unequivocally adhered" to the existing federal standards promulgated by the ICC in " 'Coal Rate Guideline,' Ex Parte No. 347." 721 F.2d at 541. This Sixth Circuit decision does *not* support the action of the Utah Commission here. The Utah Commission *refused* to recognize that by federal standards the Rio Grande was "revenue inadequate," held that the federal standard was illegal, and employed a disparate standard based on an accounting method entirely different from the federal standard applied nationwide by the ICC.

Utah Power maintains that *Illinois Central Gulf Railroad Co. v. ICC*, 702 F.2d 111 (7th Cir.1983), also supports its present contention. In this case the Kentucky Railroad Commission required that the Illinois Central Gulf Railroad return to Union Carbide $158,690.80 in demurrage charges assessed for delay caused by bad weather. The ICC affirmed the Kentucky Commission, though the applicable federal railroad tariff called for the assessment of "average demurrage" under which the shipper had no right to receive "free time" for bad weather. Thus, *both* the state authority and the ICC refused to apply the restrictions which were specified in the "average demurrage" tariff. The Seventh Circuit vacated the decision of the ICC and remanded the case to *set aside* the decision of the Kentucky Commission, ruling that the

policy of the ICC, which generally *enforced* average demurrage agreements, constituted a federal "rule" or "practice" under the Staggers Act. The court concluded that the ICC contravened Section 11501(b)(3)(A) [1] of the Staggers Act in construing the state's procedures and standards as permitting the Kentucky Commission to suspend the "average agreement" and thus allow Union Carbide to be reimbursed for demurrage due to bad weather. The result—the court completely *reversed* the State authority for failing to follow the federal rule.

■ Thus, both cases recognize the *supremacy* of federal law and standards and compel state agencies to comply therewith—in the language of the Sixth Circuit, to "unequivocally adhere." The Sixth Circuit upholds the state authority because it *did* adhere to federal standards and the Seventh Circuit reverses the ICC and the state authority because it did *not* adhere to federal standards. Neither decision supports petitioner's position that the Utah Commission is free to ignore federal standards. Nor does *Wheeling-Pittsburgh Steel Corp. v. ICC*, 723 F.2d 346, 354 (3rd Cir.1983) ("[The ICC's] standard for reviewing the standards it promulgates must be binding on the states; in no other fashion could the Commission ensure that state authorities act in conformity with federal rules.").

■ (2) *Exhaustion of Administrative Remedies.* Petitioner repeats its contention that the decision of the state authority is unreviewable, because the rail carrier failed to comply with an allegedly applicable state procedural rule (in this case, to file an application for rehearing of a decision by the state regulatory authority). The rule was part of the state standards

and procedures which the ICC provisionally certified pursuant to 49 U.S.C. § 11501(b). Petitioner's contention is fully answered by the panel's opinions. 747 F.2d at 727–29; *id.* at 744–48 (concurring statement). Both opinions interpret the state rule as intended authority that exhaustion of state administrative remedies by the Utah Legislature apply as a precondition to appeals to the Utah Supreme Court, not to reviews by a federal administrative agency. There is also abundant authority that exhaustion of state administrative remedies may not be necessary where, as it appears here, further pursuit of such remedies would be an exercise in futility. Additionally, the Staggers Act provides strong support for immediate ICC jurisdiction: "[a]ny rail carrier … may petition the [ICC] to review the decision of any State authority, in *any* administrative proceeding in which the lawfulness of an intrastate rate … is determined …" 49 U.S.C. § 11501(c) (emphasis added). *Cf. State of Texas v. United States*, 730 F.2d 409 (1984), *withdrawn and substituted in part*, 749 F.2d 1144 (5th Cir.1985).

■ (3) *Revenue Adequacy.* Petitioner asserts that the ICC's finding of "revenue inadequacy" for the Rio Grande cannot "serve as the *sole* basis" (emphasis added) for holding that the relevant rate is "reasonable." This contention mischaracterizes the action and reasons of the ICC and this court. Our decision merely stated that it was error for the Utah Commission, that previously had agreed to follow federal standards in determining revenue adequacy, to refuse to follow them. 747 F.2d at 736–37. In so doing the Utah Commission attempted to justify its action on a "fundamentally incorrect basis." *Id.* at 743. By using a system of "retirement-replacement-

---

1. 49 U.S.C. § 11501(b)(3)(A) provides:

Within 90 days after receipt of the intrastate regulatory rate standards and procedures of a State authority under paragraph (2) of this subsection, the Commission shall certify such State authority for purposes of this subsection *if the Commission determines that such standards and procedures are in accordance with the standards and procedures applicable to*

*regulation of rail carriers by the Commission under this title.* If the Commission determines that such standards and procedures are not in such accordance, it shall deny certification to such State authority, and such State authority may resubmit new standards and procedures to the Commission for review in accordance with this subsection.
(Emphasis added.)

accounting," in place of the federal standard of "retirement-replacement-betterment accounting," the Utah Commission determined that the Rio Grande had a "return on *equity* . . . [of] 15.45 percent." Petitioner alleges this is a reasonable return because Utah Power's "return on *equity*" for the same year (1980) was 12.31 percent. Brief of Petitioner at 10. However, to determine revenue adequacy the ICC requires computation and comparison of a railroad's return on *investment*, not return on *equity*. *Ex Parte No. 393*, 364 I.C.C. at 820–21. Hence, the Utah Commission improperly determined the rate of return of the Rio Grande and that it was "revenue adequate." It then used these improper conclusions as a base for justifying a 40 percent reduction in the existing tariff rate of $5.97 per ton. Consequently, the Utah Commission implicitly held that the reduced rate was reasonable and, in effect, the *maximum* reasonable rate. Utah Power also relies on the same fallacious reasoning and conclusions. Thus, only by concocting its own local standard was the Utah Commission able to declare that the railroad was "revenue adequate." In addition to these errors, there is an inherent error in determining reasonableness by a standard that compares the rate of return on the equity of a competitive railroad with that of a utility that operates as a monopoly. *Bessemer* pointed to the same error. 691 F.2d at 1113–14.[2]

▮ Even if the method employed had been proper, petitioner's reasoning is otherwise fatally flawed. Petitioner incorrectly assumes that it satisfies its burden of proof if it comes up with *any* reasonable rate. As the contending party, however, it bears the burden of proving first that the *existing* rate is *unreasonable, i.e.,* that it exceeds the *maximum* reasonable rate for the transportation. 49 U.S.C. § 10709(c).

As the court's opinion points out, there is a *range* within which rates may be found to be reasonable, and merely furnishing one rate that can be said to be reasonable does not exhaust the possibilities for a legal rate. It did not meet this burden, and this deficiency is sufficient to deny the pending Petition for Rehearing. There is no error in finding an intrastate rate unlawful where computed by a state commission in violation of applicable federal standards.

(4) *The Claim of "Revenue Inadequacy."* Utah Power contends it should be permitted in this proceeding to attack the ICC finding that the Rio Grande was "revenue inadequate." This claim is directed against the *federal standards* prescribed by the ICC for determining revenue adequacy of all railroads and is not based on contentions peculiar to the Rio Grande. The applicable federal standards were promulgated by the ICC in *Ex Parte No. 393, Standards for Railroad Revenue Adequacy, ("Ex Parte No. 393")* 364 I.C.C. 803 (Mar. 26, 1981). The rules resulted from notice and comment proceedings, 45 Fed. Reg. 80150 (1980), in which the ICC proposed standards to comply with 49 U.S.C. § 10704(a)(2):

> (2) The Commission shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under that subchapter that are adequate, under honest, economical, and efficient management, to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) *on capital employed in the business.* The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph.

**2.** Public utilities that operate as monopolies have an assured rate of return that make investments therein less risky than investments in competitive railroads. Thus, investments in competitive railroads are justly entitled to a higher return than investments in public utilities. And the relevant Congressional hearings indicate that recent financial history of American railroads demonstrate that their income generally has been inadequate for a long time. Discriminatory intrastate rates have been a substantial cause of this inadequacy. In 1977 alone the disparity between intrastate and interstate rates cost interstate rail carriers $400 million. Hence one reason Congress enacted many of the Staggers Act provisions.

(Emphasis added.) Applying that statutory standard the ICC found:

2. The standard for revenue adequacy shall be rate of return equal to the *current cost of capital.*

3. To assess the value of a railroad's rate base for the initial determination of revenue adequacy, we shall use the sum of the original cost of track assets, plus betterments to track, and the depreciated book value of all other assets. The investment base shall not be adjusted to reflect special tax provisions such as accelerated depreciation and investment tax credits. The cost of capital will be calculated using the current cost of debt and equity, and a debt-equity ratio of 40:60.

\* \* \* \* \* \*

Using the cost-of-capital standard for revenue adequacy [the ICC determined that] a railroad will be found adequate if it has a 1979 return on investment of 11.7 percent or higher. Railroads with lower returns will be considered revenue inadequate.

After analyzing the data for the 35 class I railroads, we have found that only 3 earned adequate revenues in this most recent period. These railroads are the Bessemer & Lake Erie, Elgin, Joliet & Eastern, and Fort Worth & Denver. Their rates of return were 11.7, 13.2 and 22.8 percent respectively.

*Ex Parte No. 393,* 364 I.C.C. 803, 821 (Mar. 26, 1981) (emphasis added). Applying these federal standards the ICC determined that the Rio Grande was "revenue inadequate" because it was earning a return on investment of only 8.6 percent. 364 I.C.C. at 826.

Numerous interested parties participated in the *Ex Parte No. 393* proceedings that resulted in the promulgation of the federal standards for railroad "revenue adequacy." The ICC decision states that parties participated representing numerous "shippers," *"shipper organizations,"* the U.S. Departments of Transportation and Energy, and other parties. 364 I.C.C. 803.

■ Thereafter the validity of *Ex Parte No. 393* was attacked in *Bessemer and Lake Erie R. Co. v. ICC,* 691 F.2d 1104 (3d Cir.1982), *cert. denied,* 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). The Edison Electric Institute was one of the petitioners in *Bessemer* on the claim that the "Standards of Revenue Adequacy" decreed by *Ex Parte No. 393* did not comply with section 205, as amended by the Staggers Act. The Institute is a trade association with approximately 190 public utility members denominated as subsidiaries and affiliates. Utah Power and Light Company (Utah Power) is one of its members. Joint Brief of Petitioners at xi; *Western Coal Traffic League v. ICC,* 735 F.2d 1408 (D.C. Cir.1984). To the extent petitioner attempts to rehash the same issues raised in *Bessemer* such argument is precluded by collateral estoppel. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979); *Western Coal Traffic League v. ICC,* 735 F.2d at 1411; *Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1233–36 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). Issues that are not precluded we have addressed separately.

■ Petitioner's contention that revenue adequacy should be determined by return on *equity* instead of "return on capital" (J.A. 94, 103) is particularly without merit since the Staggers Act specifies that railroads shall be allowed "revenue levels … adequate … to cover … [costs] plus a reasonable … return … on *capital employed* in the business." 49 U.S.C. 10704(a)(2). And the federal standard promulgated by the ICC provides that "return on capital" shall be the norm. *Ex Parte No. 393,* 364 I.C.C. at 809.

(5) *Reserves for deferred taxes.* Petitioner asserts also that "the ICC's Revenue Adequacy Standards are Unlawful." Brief of Petitioner at 9. Here petitioner's challenge to the validity of *Ex Parte No. 393* rests on two arguments. Petitioner contends first that the ICC "ignored [its] obli-

gat[ion] to remove deferred tax accounts from [the] railroad['s] rate," as allegedly required by this court's decisions in *Western Coal Traffic League v. ICC*, 735 F.2d 1408 (D.C.Cir.1984), *Farmers Union Central Exchange v. FERC*, 734 F.2d 1486 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984), and *San Antonio, Texas v. United States*, 631 F.2d 831 (D.C.Cir.1980), *clarified*, 655 F.2d 1341 (D.C.Cir.1981), *rev'd on other grounds sub nom. Burlington Northern, Inc. v. United States*, 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982). Petitioner secondly argues that the pre-1981 revenue adequacy standards promulgated in *Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination)*, 362 I.C.C. 198, 294–341 (Dec. 6, 1979), *reh'g denied*, 362 I.C.C. 794 (May 30, 1980), were "realistic" and that those in *Ex Parte No. 393* are unrealistic. The latter are allegedly "unique," as though that makes them illegal.

■ Petitioner thus principally attacks the inclusion of "reserves for deferred taxes" in a railroad's rate base. Petitioner plainly infers that because the ICC did not "remove deferred tax accounts from [the] railroad rate base," the ICC's determination of the "appropriate rate" for the movement of coal by the Rio Grande's unit train was contrary to prior decisions of this court and therefore invalid. However, the argument does not wash; it fails to come to grips with the underlying basis of the decisions of this court that it cites.

In *San Antonio, supra*, this court correctly held on *July 16, 1980* that "reserves for deferred tax accounts" should *not* be included in the railroad's rate base *because* the federal standard applicable *at that time* provided for their *exclusion*. 631 F.2d at 847. *See Ex Parte No. 338, Establishment of Adequate Railroad Revenue Levels*, 359 I.C.C. 270 (1978). Eight months later on *March 26, 1981*, in *Ex Parte No. 393, supra*, the ICC reversed its position and promulgated a *different standard* which provided that reserves for deferred taxes *should be included* in the rate

base. Thus, when the Utah Commission decided *Utah Power on December 20, 1982, Ex Parte No. 393, supra*, set forth the controlling federal standard.

In *Ex Parte No. 393* the ICC thoroughly considered the proper treatment of "reserves for deferred taxes" and set forth the following reasoned analysis as justification for their *inclusion* in the rate base:

In valuing the asset base, we also must consider how to treat funds obtained through tax provisions such as accelerated depreciation and investment tax credits. In the past, we have deducted deferred taxes (which generally result from use of accelerated depreciation) from the net investment base. This policy was explained in Ex Parte No. 338, where we wrote:

We are cognizant of the fact that this treatment confers a benefit on the carriers, in that they are receiving and retaining revenue which is not accounted as income. As indicated by some of the parties, the capital funds arising from deferred taxes have been contributed by the ratepayers rather than by investors in the company. Thus, it is appropriate to deduct the deferred tax account from the net investment rate base prior to any calculation of rate or return.

This issue has come before us many time [sic] subsequently. For example, we considered it—and reached a different conclusion—in Ex Parte No. 347 (Sub. No. 1), *Coal Rate Guidelines—Nationwide*, 364 I.C.C. 360. We believe, after weighing all the concerns expressed by parties on both sides of this issue, that *deferred taxes should not be removed from the net investment base for ratemaking purposes.*

In our notice of proposed guidelines in Ex Parte No. 347 (Sub-No. 1), we said:

The deferred tax account can be considered a source of funds freed up for reinvestment. These funds constitute a substantial part—up to 20 percent in some cases—of the total capital available to individual railroads for this pur-

pose. To the extent that the railroads are not allowed to earn a return on investments made with these funds, the incentive to undertake railroad investments with such funds is substantially reduced. Instead, an environment is created in which there is an incentive to take funds generated within the railroad industry and invest them elsewhere, where market-determined rates of return are available. We are concerned that this may thwart the intent of Congress in passing the Revenue Acts of 1954 and 1962, to provide business enterprise with tax benefits as a means of spurring capital spending.

While we are not considering ratemaking per se here, the economic principle is the same. If we exclude internally generated funds, whether stemming from accelerated depreciation or any other railroad activity, from the investment base, the effect will be to establish a rate of return below the cost of capital. This, in turn, will result in incentives to railroads to invest these funds in nonrail operations. In short, we are concerned that exclusion of the deferred tax account from the investment base would conflict with our duty under section 10704(a)(2)(A) of the Interstate Commerce Act as amended by the Rail Act to set revenue adequacy figures at levels that would "provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation."

We have carefully considered the argument presented in the verified statement of George H. Borts on behalf of the Western Coal Traffic League that special tax provisions should be excluded from the investment base since in a competitive industry competition will force the firm to pass the tax savings on to consumers in the form of lower prices. We reject this argument for two reasons. First, we again point out that we are not guaranteeing any railroad any rate of return. If competition generally has the effect postulated by Mr. Borts, then it will also have this effect on railroads. Second, we find the reasoning to be in error in two respects. The first is that tax (or other savings) will not be passed through to consumers if railroads are not covering economic costs, including the costs of capital. Railroads will either use these savings to help recover economic costs or will leave the market if they believe recovery is not likely. Our second concern with this reasoning is that while it is correct that if funds provided through tax benefits are restricted to use in a particular industry, then the additional investment may somewhat lower prices charged by that industry; however, as we explained above, the railroad industry must compete with all other industries for investment funds. The cost of capital reflects the minimum required rate of return expected by investors if they are to provide funds *after* all tax (and other) provisions are considered. That is, the cost of capital reflects the actual competitive return. We thus, reject this argument and conclude that the investment base should not be adjusted to reflect special tax provisions such as accelerated depreciation and investment tax credits.

*Ex Parte No. 393*, 364 I.C.C. at 813–14 (emphasis added).

After the promulgation of *Ex Parte No. 393* on *March 26, 1981* its validity was attacked in the Third Circuit in *Bessemer and Lake Erie R. Co. v. ICC*, 691 F.2d 1104 (3d Cir.1982). On *October 19, 1982* the *Bessemer* court held that the ICC's reasons for departure from its prior position were adequately explained and that the standard promulgated in *Ex Parte No. 393* with respect to reserves for deferred taxes was valid and beyond the power of the courts to disturb. 691 F.2d at 1116.

Petitioner's present argument that this division erred in not following this court's decision in *San Antonio* is thus without merit. Following *San Antonio* the Commission had legally promulgated a *differ-*

ent federal standard. It was this later standard embodied in *Ex Parte No. 393*, requiring the *inclusion* of reserves for deferred taxes in the rate base, that the Utah Commission was required to apply.

Neither of the two other cases from this circuit cited by Utah Power compel a different result. *Western Coal, supra,* merely held that the petitioners there were collaterally estopped from attacking the ICC decision for the alleged infirmities previously decided contrary to the contentions advanced by their trade association against *Ex Parte No. 393* in *Bessemer.* *See* part (4) *supra.* Here, that includes petitioner's repetitious challenge regarding reserves for deferred taxes decided in *Bessemer.* 691 F.2d at 1115–16. *Western Coal,* moreover, cannot be construed as holding that "reserves for deferred taxes" must be included in *any* valid rate base. It merely refers to our decision in *San Antonio,* requiring such reserves to be included by the then existing federal standards, which have now been altered.

[11] As for *Farmers Union, supra,* the record amply supports the conclusion that the ICC in promulgating the federal standards gave full consideration to responsible alternative rate-making methodologies and gave reasoned explanations in support of the rate-making methodology it promulgated. If petitioners are attempting to assert that *Farmers Union* required the ICC in the present case to go beyond applying the *existing* federal standards of *Ex Parte No. 393* and to consider the revenue adequacy and rate-making scheme applied by the Utah Commission, the answer is given by Judge Ginsburg in *Western Coal:* Congress "did not command the ICC to behave like Penelope, unravelling each day's work to start the web again the next day." 735 F.2d at 1411. The Act provides that "[t]he Commission shall maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers." 49 U.S.C. § 10704(a)(2). This neither suggests nor requires that duly promulgated federal standards be changed willy-nilly.

(6) *Cost Factors.* Petitioners object to our refusal not to get further involved in some of the "cost" factors as set out in the ICC's cost appendix. Our initial opinion commented and acted on some cost items and further discussion is not necessary because, since the Commission refused to follow federal standards, the reduced rate it ordered, as set forth above, must therefore be set aside on that ground. This leaves the existing rate as the "appropriate rate," which the ICC is free to modify on remand if, within the area of the court's limited remand, it finds any justifiable basis for doing so.

(7) *The Appropriate Rate Related to Variable Costs.* Utah Power relies on the conclusion of the Utah Commission that the Rio Grande could not "charge higher rates for traffic than [the Utah Commission] ordered, [which permitted] 181.2% of variable costs" (J.A. 105–06). This contention is based on the erroneous assumption that if a rate is presented that can be said to be reasonable *on any basis* the ICC cannot approve any higher rate. This approach fails to recognize that Utah Power here bears the ultimate *burden* of proving that the *existing* $5.97 per ton rate, originally agreed to by Utah Power and ordered by the Utah Commission, which the ICC found was the "appropriate rate," exceeds a *reasonable maximum* using federal standards. 49 U.S.C. § 10709(c). That a revenue/variable cost ratio exceeds that provided by § 10709(d)(2) creates no presumption that the rate exceeds a reasonable maximum. 49 U.S.C. § 10709(d)(4). A shipper's burden is not satisfied by presenting another rate allegedly reasonable on some other theory. While Utah Power asserts the rate it proposes at 181.2% of variable costs is adequate, the ICC attacks this contention on the ground that such rate would not make an effective contribution toward revenue adequacy:

[The rate prescribed] by the [Utah Commission is] only 11 percent above the current jurisdictional threshold, and we must reach the ... conclusion [that such rate does not make an effective contribu-

tion toward revenue adequacy.] The 181.2-percent rate ceiling relies upon cost calculations which are understated, as explained by our analysis in the appendix to this decision. It also involves an arbitrary doubling of the 1980 desired cost of capital figure of 19 percent, which is unsupported by valid economic principles. For the stated reasons, including our above discussion of the [Salt Lake, the Utah Commission's] findings of revenue adequacy for the carriers transporting the considered coal movement are either not in accordance with Federal standards or not material in determining whether the assailed rate level exceeded a maximum reasonable basis.

(J.A. 593). Applying proper federal standards and adjudicatory precedents the ICC found that the existing rate represented "208.7 percent of variable costs" (J.A. 593; 747 F.2d at 742). Prior ICC adjudications had determined that rates ranging from 209 to 255, and from 213.8 to 255.7 percent of variable costs were reasonable. *Id.* at 742 & n. 25. The ICC was justified in relying on its adjudicatory precedents in determining that the Rio Grande's "existing rate" was "appropriate," reasonable, and not in excess of a reasonable maximum.

██ (8) *The Savings Provisions of the Staggers Act.* Petitioner next inquires whether the savings provisions (§ 229) of the Staggers Act has been rendered a nullity because Utah Power had previously "agreed to that rate" and "had, without objection, [shipped] under it for almost two years." This savings clause permitted parties for a limited period of time to attack existing rates. 94 Stat. 1934. The answer to the inquiry is that it was not rendered a nullity by the existence of a prior agreed rate ordered by the Utah Commission, but

neither does § 229 guarantee the success of attacks made on invalid bases. However, framing the inquiry as petitioner does excludes certain substantial factors that are material to the issue. Since the rate is an *existing* rate, and the shipper is the party attacking the rate, the shipper bears the burden of proving under *federal standards* that the rate *exceeds* a "reasonable maximum" for the transportation. 49 U.S.C. § 10709(c). That Utah Power had previously agreed to the rate, that the Utah Commission had ordered it, and that the rate had been applied to coal shipments without objection for two years does create a more difficult obstacle for the shipper to overcome than if the rate had been a newly proposed rate and had not previously been agreed to and ordered by the regulatory authority. Petitioner's burden, however, is not necessarily satisfied merely by presenting another rate that is arguably barely reasonable.

(9) *Summary.* The weakness of the contentions of Utah Power and the Utah Commission is illustrated by the fact that in opposing the existing rail rate petitioners considered that they are *permitted* (1) to attack and to ignore the federal standards under which the ICC determined that the Rio Grande was "revenue inadequate," (2) to substitute a method of accounting different from the federal standard, thus producing a different rate of return for the railroad, (3) to switch from the established federal standard of return on *investment* to return on *equity,* (4) to refuse to recognize that they bore the burden of proving that the existing rate *exceeded a reasonable maximum,* and (5) that they are bound to prevail merely because they presented a rate that was arguably borderline reasonable.[3]

---

**3.** As to "reciprocal switching," previously discussed at 747 F.2d at 740–41, we further note that the Act recognizes the right of the carriers to establish the compensation applicable:

> The Commission may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competi-

tive rail service. *The carriers entering into such an agreement shall establish the conditions and compensation applicable to such agreement,* but, if the carriers cannot agree upon such conditions and compensation within in a reasonable period of time, the Commission may establish such conditions and compensation.

49 U.S.C. § 11103(c)(1) (emphasis added).

The Petition for Rehearing is denied.

*Order accordingly.*

GINSBURG, Circuit Judge, concurring in denial of rehearing:

I concur in the denial of rehearing. Finding no merit in the petition beyond the therapeutic value it may have for its authors, I do not join Judge MacKinnon's point-by-point response. Instead, I append only brief clarification on two matters.

(1) As to "exhaustion of [state] administrative remedies," I adhere to the position stated for Judge Wilkey and myself in 747 F.2d at 744–48.

(2) On the ICC's standards for determining revenue adequacy, it suffices to observe that Utah Power & Light Co. (UPL) is a member of the Edison Electric Institute, a trade association that appeared in court, as a petitioner, in *Bessemer & Lake Erie Railroad v. ICC,* 691 F.2d 1104 (3d Cir.1982), *cert. denied,* 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). Therefore, UPL may not relitigate the validity of the standards announced in *Ex Parte No. 393, Standards for Railroad Revenue Adequacy,* 364 I.C.C. 803 (1981), and judicially reviewed in *Bessemer.* We explained and applied the relevant rule of issue preclusion in *Western Coal Traffic League v. ICC,* 735 F.2d 1408 (D.C.Cir.1984). *See Aluminum Co. of America v. ICC,* 761 F.2d 746 at 751 (D.C.Cir. May 10, 1985).