**SOUTHERN PACIFIC TRANSPORTA-TION COMPANY, et al., Plaintiffs-Appellants Cross-Appellees,**

v.

**SAN ANTONIO, TEXAS, Acting By and Through its CITY PUBLIC SERVICE BOARD, Defendant-Appellee Cross-Appellant.**

No. 84–1059.

United States Court of Appeals, Fifth Circuit.

Nov. 29, 1984.

Sidley & Austin, Thomas W. Merrill, R. Eden Martin, Chicago, Ill., for plaintiffs-appellants cross-appellees.

Timm L. Abendroth, Atty., I.C.C., Washington, D.C., for intervenor-I.C.C.

Donald G. Avery, Kelvin J. Dowd, John H. LeSeur, William L. Slover, Washington, D.C., J. David Forsyth, New Orleans, La., for defendant-appellee cross-appellant.

Before GOLDBERG, REAVLEY and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

The opinion delivered on October 9, 1984 is withdrawn and is replaced by the following.

This action represents the latest stage in the long and exceedingly complex litigation between two railroads—Burlington Northern, Inc. ("Burlington Northern") and Southern Pacific Transportation Company ("Southern Pacific")—and the city of San Antonio, Texas. The railroads contracted

with San Antonio to transport coal to be used in the city's coal-fired power plant. Contract negotiations began in 1974, and the railroads originally quoted a rate of $7.90 per ton. By 1975, the railroads had raised the rate to $11.90 per ton in the face of high inflation. In May 1975, San Antonio filed a complaint with the Interstate Commerce Commission ("I.C.C.") challenging the rate as unreasonable and seeking reparations. The I.C.C. issued a decision establishing a rate of $10.93 per ton. *See San Antonio v. Burlington Northern*, 355 I.C.C. 405 (1976) ("*San Antonio I*"). The Commission emphasized that the rate was temporary and that the parties could petition for a modification of the order. *Id.* at 417–18; *see also Burlington Northern v. United States*, 459 U.S. 131, 103 S.Ct. 514, 517, 74 L.Ed.2d 311 (1982). The *San Antonio I* decision was affirmed on appeal to the Eighth Circuit.[1]

In 1978, the Commission issued a new order ("*San Antonio II*") in which it found that the maximum rate should be increased to $16.12 per ton.[2] In 1979, a third order ("*San Antonio III*") was issued, resulting in a new maximum rate of $17.23.[3] The railroads then filed tariffs with the Commission at the $17.23 rate. Those tariffs were still on file during the period in dispute in this case—June 24, 1980, to May 6, 1981.[4]

### A. The D.C. Circuit Action: San Antonio v. United States

In the meantime, though, the dispute over the rates had continued to boil. San Antonio and the railroads filed cross-petitions in the D.C. Circuit for review of the *San Antonio II* and *San Antonio III* prescriptions. In June 1980, the Court of Appeals decided that aspects of both orders were "arbitrary and capricious." *San Antonio v. United States*, 631 F.2d 831, 851 (D.C.Cir.1980). The court vacated the Commission's orders and remanded the case to the Commission. The question arose, however, as to which rate would apply during the period until the I.C.C. determined a new maximum rate. Put differently, what immediate effect did the D.C. Circuit's judgment have on the rate that San Antonio was required to pay? This issue was important because the railroads continued to ship coal for San Antonio. Indeed, between June 24, 1980, and May 6, 1981, they shipped nearly three million tons of coal for the city.

San Antonio refused to pay the published tariff rate during this period and unilaterally reduced its payments to the level set by *San Antonio I*.[5] It theorized that the vacation of *San Antonio II* and *San Antonio III* by the D.C. Circuit had operated to "revive" the *San Antonio I* rate. San Antonio's failure to pay the tariff rate during the period resulted in a savings to it—and a loss to the railroads—of $19,832,-596.93.[6]

Ultimately, on April 7, 1981, the I.C.C. issued a decision ("*San Antonio IV*") formally vacating *San Antonio I* and requiring the city to resume paying the *San Antonio III* tariff rate *pendente lite*.[7] The

---

**1.** *See Burlington Northern v. United States*, 555 F.2d 637, 648 (8th Cir.1977).

**2.** *See Burlington Northern v. United States*, 359 I.C.C. 1 (1978).

**3.** *See San Antonio v. Burlington Northern*, 361 I.C.C. 481 (1979).

**4.** The tariffs as well as the *San Antonio I* and *II* rates have been escalated by subsequent "general increases," but these increases are irrelevant to our analysis, and we will continue to refer to the rates as *San Antonio I, II,* and *III*.

**5.** Again, the *San Antonio I* rate had been adjusted by "general rate increases." *See supra* note 4.

**6.** The parties have stipulated to this amount. *See* Appellant's Brief at 6, n. 5; *see also Burlington Northern v. United States*, 103 S.Ct. at 519 n. 4.

**7.** The order stated:

> San Antonio, TX, shall pay the published tariff rate, until such time as the Commission determines that rate to be in excess of a maximum reasonable rate or otherwise unlawful.

*San Antonio v. Burlington Northern*, 364 I.C.C. 887, *aff'd*, 650 F.2d 49, *clarified*, 652 F.2d 422 (5th Cir.1981).

order became effective thirty days later, and the city began paying the rate on May 7, 1981. A question remained, however, concerning the rate applicable during the interim period between the D.C. Circuit's judgment and the *San Antonio IV* order— i.e., the period from June 24, 1980, to May 6, 1981. Even though San Antonio was required to pay the *San Antonio III* rate *after* May 6, the parties disagreed about whether the *San Antonio I* rate had revived and become applicable to shipments prior to May 6. The I.C.C. had failed to decide this issue in *San Antonio IV*. Noting that the "rate revival" theory was already being litigated before the D.C. Circuit, the Commission chose to defer to the judgment of the courts.[8]

Shortly thereafter, the D.C. Circuit issued a clarification of its 1980 holding. It held that the *San Antonio I* rate had revived by virtue of the vacation of *San Antonio II* and *San Antonio III*. Thus, the city was required to pay only at the *San Antonio I* rate for the period from June 24, 1980, to May 6, 1981. Tariffs set in excess of that rate were unlawful. *San Antonio v. United States*, 655 F.2d 1341 (D.C.Cir.1981).

The Supreme Court granted certiorari and, in a unanimous opinion, reversed. The Court held that the D.C. Circuit's action in striking the orders in *San Antonio II* and *III* nevertheless operated to leave the tariff in effect until the I.C.C.'s redetermination of a reasonable rate. If the Commission later determined that the tariff rate was too high, San Antonio could collect reparations. *Burlington Northern v. United States*, 103 S.Ct. at 522.

*B. The Fifth Circuit Action:* Southern Pacific Transportation v. San Antonio

After the Supreme Court's decision, the railroads moved to reactivate a collection action that had been lying dormant in the United States District Court for the Western District of Texas. The railroads had originally filed the action in 1981 to recover over $19.8 million, plus interest, representing the freight charges withheld by San Antonio between July 1980 and May 1981. The suit was held in abeyance, however, pending the outcome of the litigation in the D.C. Circuit and the Supreme Court.

Even after the Supreme Court had issued its opinion in *Burlington Northern v. United States*, San Antonio continued to oppose the reopening of the Texas suit. The city argued that some issues remained unresolved before the D.C. Circuit. On May 20, 1983, however, that circuit issued an order in which it found that "there are no issues which require briefing and argument before this Court." *San Antonio v. United States*, No. 78–2051, Order (May 20, 1983). Subsequently, the Texas District Court reactivated the collection action. *Southern Pacific Transportation v. San Antonio*, No. SA–81–CA–71, Memorandum Order (June 9, 1983). After the case was reopened, San Antonio filed a counterclaim seeking reparations for alleged overpayments. The city sought $24 million for reimbursement of unreasonable rates charged by the railroads between December 1, 1978, and July 24, 1980, as well as $50 million for reimbursement of rail increases after October 1, 1980. The city was already litigating both of these claims in a pending I.C.C. action, *San Antonio v. Burlington Northern*, Docket No. 36180.

In December 1983, the District Court granted summary judgment on the principal claim by the railroads and awarded them $19,832,596.93 in damages. The court, however, stayed execution of the judgment until the resolution of I.C.C. Docket No. 36180. "This [was] done in order not to interfere with the primary jurisdiction of the Commission to determine the reasonableness of the tariff rate for the period in question." *Southern Pacific Transportation v. San Antonio*, No. SA–81–CA–71, Memorandum Opinion and Order (December 5, 1983).

The railroads have sought to escape the district court's stay by appeal and by man-

---

**8.** Nevertheless, the Commission did argue in a footnote to its opinion that the *San Antonio I* rate had not revived. *See San Antonio IV,* 364 I.C.C. at 892 n. 3.

damus. We dismiss the appeal. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 477 n. 30, 98 S.Ct. 2454, 2462 n. 30, 57 L.Ed.2d 351 (1978); *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). But we grant the mandamus.

## I. MANDAMUS

The railroads have requested that this court treat their Motion for Expedited Consideration as a petition for writ of mandamus and their appellate brief as a brief in support of that petition. This request is more than adequate. *Cf. United States v. Briggs,* 514 F.2d 794, 808 (5th Cir.1975) (court has discretion to treat mere appeal as petition for writ of mandamus).

■ Mandamus is an extraordinary remedy reserved for extraordinary cases. *Ex Parte Fahey,* 332 U.S. 258, 259–60, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947). Mandamus "is awarded, not as a matter of right, but in the exercise of a sound judicial discretion." *Duncan Townsite Co. v. Lane,* 245 U.S. 308, 311, 38 S.Ct. 99, 101, 62 L.Ed. 309 (1917). Mandamus is appropriate to correct the grant of a stay which amounts to a clear abuse of discretion. *Smith v. Pinell,* 597 F.2d 994, 997 (5th Cir.1979).[9]

We believe that this case is extraordinary and calls for the exercise of our discretionary power because the district court clearly abused its discretion in granting the stay of execution of the railroads' judgments. *See infra* Part II A. Therefore, this court may review the stay. Furthermore, although the issues of the district court's decision on the merits of the railroads' claim and the prejudgment interest issues may not independently be grounds for mandamus, the

issues are related to the stay and may therefore be reviewed. 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3934 (1977).

## II. THE MERITS

### A. Propriety of the Stay

■ A trial court has discretion to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). The decision of a court to stay the execution of judgment will generally be overturned only if the court has abused its discretion. *See Geddes v. United Financial Group,* 559 F.2d 557, 561 (9th Cir. 1977); *Wisconsin Liquor v. Park & Tilford Distillers,* 267 F.2d 928, 933 (7th Cir. 1959). The trial court in this case did abuse its discretion.

■ We should point out initially that the underlying judgment for the railroads is correct. The District Court concluded that:

> The United States Supreme Court has held in *Burlington Northern, Inc., et al., v. United States, et al.* [459 U.S. 131], 103 S.Ct. 514 [74 L.Ed.2d 311] (1982) that the rate in effect for coal shipment for the period in question was the tariff rate filed under the authority of the Interstate Commerce Commission [i.e., the *San Antonio III* rate], not the *San Antonio I* rate as contended by Defendant. *Id.* [103 S.Ct.] at 522.

*Southern Pacific Transportation v. San Antonio,* No. SA–81–CA–71, Memorandum Opinion and Order at 1 (December 5, 1983). This is a correct reading of the *Burlington Northern* case. The Supreme Court clearly held that the filed tariff rate should apply during the interim period. As the Court stated:

---

**9.** Justice Rehnquist's opinion in *Will v. Calvert Fire Insurance,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), arguably raises some doubt whether this use of mandamus will continue to be proper in future cases. However, the opinion did not command a majority of the court. Four justices continued to apply the "clear

abuse of discretion" standard. *See id.* at 676, 98 S.Ct. at 2564 (Brennan, J., dissenting), *citing La Buy v. Howes Leather Co.,* 352 U.S. 249, 257, 77 S.Ct. 309, 314, 1 L.Ed.2d 290 (1957). A fifth did not address the issue. *See id.* 437 U.S. at 667, 98 S.Ct. at 2559 (Blackmun, J., concurring).

[W]here there is a dispute about the appropriate rate, the equities favor allowing the carrier's rate to control pending decision by the Commission, since under the Act, the shipper may receive reparation for overpayment while the carrier can never be made whole after underpayment.

. . . . .

In striking the orders in *San Antonio II* and *III*, the [D.C. Circuit] court's action operated to leave in effect the rates filed under the Commission's authority pending the Commission's redetermination of a reasonable rate and subject always to reparations to protect the shipper should the Commission find that these rates were too high.

*Burlington Northern v. United States*, 103 S.Ct. at 522.[10]

 There being no factual dispute about the amount owed, the District Court

properly granted summary judgment. The court, however, stayed execution of that judgment on the theory that execution would "interfere with the primary jurisdiction of the Commission to determine the reasonableness of the tariff rate for the period in question." San Antonio also suggests that the court had discretion to stay the judgment in order to offset the defendant's counterclaims against the plaintiffs' claim. The court's explicit reason for the stay is plainly incorrect; execution of the judgment would not impair the I.C.C.'s primary jurisdiction. Moreover, a stay, even for the reason stated by San Antonio, would undermine the Supreme Court's holding in *Burlington Northern* and conflict with the traditional "filed rate" doctrine. Because the stay contravenes both the high court's intent in this case and more general principles of railroad law, we hold that the trial court abused its discretion.[11]

---

**10.** San Antonio argues that the Supreme Court's holding was much more limited. In this view, the Court merely held that the D.C. Circuit had no authority to decide which rate applied. That issue was for the I.C.C. Therefore, the D.C. Circuit should have remanded the case to the Commission.

The city's argument is refuted, however, by the Supreme Court's unambiguous language. The Court clearly exercised the authority to define which rate applied during the interim period. *Id.* at 521, 522. It simply held that the D.C. Circuit had no authority to apply a *different* rate.

Moreover, the I.C.C. has already made clear that it would reach the same result as the Supreme Court if there were a remand. In *San Antonio IV*, the Commission commented that the *San Antonio I* rate should not revive during the interim period. Furthermore, it argued before the D.C. Circuit that that court's revival of *San Antonio I* conflicted with the Commission's policy in *San Antonio IV* (which, of course, had held that the filed rate should apply during the period following the "interim period" involved here). Finally, the Commission argues as an intervenor before this court that the filed rate should apply. *See Brief of Intervenor* at 10–11. Indeed, the Commission maintains that it has made its views clear and that a remand would be unnecessary. *Id.*

**11.** The railroads also argue that the District Court has no jurisdiction to hear San Antonio's

reparations counterclaims. This is incorrect. Although the notion of exclusive jurisdiction in the I.C.C. may once have found voice in the Supreme Court, *see Texas & Pacific Railway v. Abilene Cotton Oil,* subsequent cases have established that reasonableness claims may be brought in federal court. *See, e.g., General American Tank Car v. El Dorado Terminal,* 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940); *United States v. Kansas City Southern Railway,* 217 F.2d 763, 776 (8th Cir.1954).

A more promising argument is that the city is barred from bringing its counterclaims in federal court by the "election of remedies" doctrine. The city has elected to bring its claims initially in the I.C.C. (in Docket No. 36180); therefore, it arguably may not bring the same claims in federal court. The District Court has yet to address this issue, so we will refrain from deciding the question now. However, the trial court should consider on remand whether the doctrine applies in our case and whether the issue has been timely raised by the railroads.

For the sake of clarification, we do point out that the doctrine still has force after the 1978 recodification of the Interstate Commerce Act. The former act explicitly provided:

Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable

**(1)** *Primary Jurisdiction*

■ The doctrine of primary jurisdiction requires the I.C.C. to decide certain issues before the federal courts address them. *See Texas & Pacific Railway v. Abilene Cotton Oil,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *B. Mezines, J. Stein, & J. Gruff, Administrative Law* § 47.01 *et seq.* (1984); *K. Davis, Administrative Law* § 19.01, at 373 (3d ed. 1972). This procedure is designed to produce uniformity and bring agency expertise to bear on complicated technical questions. *See Texas & Pacific Railway; Great Northern Railway v. Merchants Elevator,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); *J. Guandolo, Transportation Law,* at 804 (3d ed. 1979). Other, less technical issues are left to the courts' initial determination. For example, where the reasonableness of a rate is at issue, "there must be preliminary

under the provisions of this chapter in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt.

49 U.S.C. § 9 (1970) (emphasis supplied). The underscored language was deleted, however, in the recodified version, which provides:

A person may file a complaint with the Commission under section 11701(b) of this title or bring a civil action under subsection (b)(1) or (2) of this section to enforce liability against a common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I or III of chapter 105 of this title. A person may begin a proceeding under section 10704 or 10705 of this title to enforce liability under subsection (b)(3) of this section by filing a complaint with the Commission under section 11701(b) of this title.

49 U.S.C. § 11705(c)(1). This left an ambiguity in the statute as to whether a plaintiff could pursue both remedies simultaneously. The new provision permits a complaint with the Commission *or* an action in the federal court; but does it permit an I.C.C. action *and* a federal action? This ambiguity is resolved by reference to the legislative history. The drafters of the bill intended that the election of remedies requirement would continue to apply. As the House Report states,

The words "and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt" in 49:9 are omitted as surplus.

resort to the Commission." *Great Northern Railway,* 259 U.S. at 291, 42 S.Ct. at 479. The determination of reasonableness

is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.

*Id.* at 291–92, 42 S.Ct. at 479. Thus, courts often interpret the terms of a filed rate but refer to the I.C.C. any questions concerning the reasonableness of that rate.[12]

In the present case, forcing San Antonio to pay the filed rate immediately would not

H.R.Rep. No. 95–1395, 95th Cong., 2d Sess. 192, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009, 3201 [hereinafter cited as "House Report"] (there was no Senate Report submitted with the legislation). The House Report does not explain why the words "but such person or persons shall not have the right to pursue both of said remedies" were also omitted. Perhaps they were removed by accident. In any event, it seems clear that the drafters intended the remaining language of § 11705(c)(1) to require election of remedies, since the deleted words were "mere surplus."

This construction accords with the drafters' stated intent to recodify the laws "without substantive change." *House Report* at 4, *reprinted in* 1978 U.S.Code Cong. & Ad.News, *supra,* at 3013; *see also Celanese Chemical v. United States,* 632 F.2d 568, 573 n. 9 (5th Cir.1980). Thus, we conclude that section 11705(c)(1) still requires a shipper to elect remedies.

**12.** Construction of the tariff itself may be within the agency's primary jurisdiction if the

words in [the] tariff are used in a peculiar or technical sense, and [if] extrinsic evidence is necessary to determine their meaning or proper application, so that "the inquiry is essentially one of fact and of discretion in technical matters."

*United States v. Western Pacific Railroad,* 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956). Such is not the case here, however. As we have seen, the Supreme Court determined that it could construe the rate applicable during the interim period and, in fact, the Court went ahead and delineated the appropriate rate. *See supra* note 10.

interfere with the I.C.C.'s primary jurisdiction to determine reasonableness. The fact that the rate has already been paid does not change the Commission's inquiry. The I.C.C. scrutinizes the same rate terms (as interpreted by the District Court) whether or not payment has been made. Furthermore, execution of the railroads' judgment would not render the I.C.C.'s determination moot or ineffectual. If the Commission later determined that the rate was unreasonable, San Antonio could collect reparations. *See Burlington Northern v. United States*, 103 S.Ct. at 520–22; *Texas & Pacific Railway v. Abilene Cotton Oil.* As the Supreme Court stated in *Burlington Northern:*

> The shippers ... are fully protected by the reparation provision [of the Interstate Commerce Act] which requires carriers to reimburse shippers if the Commission later determines that the filed rate was unreasonable.

103 S.Ct. at 520.[13] The Court explicitly noted the availability of "reparations to protect" San Antonio in this case. *Id.* at 522.

In sum, the primary jurisdictions of the I.C.C. would not be impaired by immediate execution of the judgment for the railroads.[14]

### (2) *Conflict with Burlington Northern*

Moreover, the stay undermines the Supreme Court's result in *Burlington Northern.* As we have seen, the Court clearly intended the tariff rate to be binding during the period from June 1980 to May 1981. The Court contemplated that Southern Pacific and Burlington Northern would be able to collect that tariff immediately. Hence the opinion contained repeated reminders that reparations would be paid later if the rate proved to be unreasonable. *See* 103 S.Ct. at 521, 522. Most important, the Court held that no federal judge could

interfere with the timing of the tariff rate by delaying its effectiveness. *See id.* at 521, 522, *citing Consolidated Rail v. Nat'l Ass'n of Recycling Industries*, 449 U.S. 609, 612, 101 S.Ct. 775, 777, 66 L.Ed.2d 776 (1981), and *Arrow Transportation v. Southern Railway*, 372 U.S. at 668, 83 S.Ct. at 989. The Court explained:

> Congress meant to foreclose a judicial power to interfere with *timing* of rate changes....

> By entering an order declaring that the *San Antonio I* rate order was "revived" for the period June 1980—May 1981, the Court of Appeals did that which we have said a federal court may not do: *i.e.,* freeze the rate that railroads charge shippers prior to a decision by the Commission as to what a reasonable rate should be.

*Burlington Northern*, 103 S.Ct. at 520, 521.

Yet the District Court's stay in this case has precisely the same effect—freezing the rate at the *San Antonio I* level. The stay insures that the tariff rate will not control during the interim period, that its effectiveness will be delayed until the Commission is able to resolve Docket No. 36180. By thus affecting the timing of the rate, the trial court's order accomplishes that which the Supreme Court has said a court may not do. Therefore, the order undermines the result in *Burlington Northern* and cannot stand.

### (3) *Filed Rate Doctrine*

Finally, the ongoing delay in payment of the rate is inconsistent with the traditional "filed rate" doctrine.[15] That doctrine is premised on a distinction between a "legal" rate and a "lawful" rate. The legal rate is the tariff rate published and filed with the I.C.C. The lawful rate is a legal rate which has also been determined by the Commission to be reasonable and acceptable under

---

**13.** The Court used these words in describing *Arrow Transportation v. Southern Railway*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), but later pointed out that it could "discern no basis to distinguish [the San Antonio] case from *Arrow ....*" 103 S.Ct. at 521.

**14.** We note that the I.C.C. agrees with our conclusion. *See* Brief of Intervenor at 12.

**15.** We treat this doctrine separately from the holding in *Burlington Northern* because the Supreme Court expressly declined to address the filed rate doctrine. *See* 103 S.Ct. at 522 n. 10.

the requirements of the Interstate Commerce Act. *See Arizona Grocery v. Atchison, Topeka & Santa Fe Railway,* 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932); *J. Guandola, supra,* at 475. A railroad is required to charge the legal (filed) rate, and a shipper is required to pay that rate when due. As the Supreme Court stated in *Pennsylvania Railroad v. International Coal Mining,* 230 U.S. 184, 187, 33 S.Ct. 893, 894, 57 L.Ed. 1446 (1913),

> The tariff, so long as it was of force, was, in this respect, to be treated as though it had been a statute, binding as such upon railroad and shipper alike. If, as a fact, the rates were unreasonable, the shipper was nevertheless bound to pay and the carrier to retain what had been paid, leaving, however, to the former, the right to apply to the Commission for reparation.

In *Arizona Grocery,* the Court reiterated:

> Under section 6 [recodified at 49 U.S.C. § 10761(a)], the shipper was bound to pay the legal rate; but, if he could show that it was unreasonable, he might recover reparation.

284 U.S. at 384, 52 S.Ct. at 184.

The filed rate doctrine has developed largely to prevent a railroad from discriminating between shippers by giving selected "voluntary rebates." That particular purpose is not relevant to our case, in which only one shipper (the defendant) moves coal along the route between Wyoming and San Antonio. However, the Supreme Court has noted that the doctrine

> is equally important to aid the efforts of a carrier in collecting published charges in full. Involuntary rebates from tariff rates should be viewed with the same disapproval as voluntary rebates.

*Lowden v. Simonds-Shields-Lonsdale Grain,* 306 U.S. 516, 520–21, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939). The Interstate Commerce Act thus entails a balanced and coherent system for the payment and review of rates. The shipper is required to pay the filed rate at the time of shipment but may later seek review and reparations in the I.C.C. The carrier, on the other hand, receives assurance that payment will not be delayed pending review; but the carrier must be prepared to reimburse amounts later found to be unreasonable.

The great delay in payment of the tariff rate in this case has already interfered with the filed rate system.[16] The trial court's stay only threatens to add further, indefinite delay as the plaintiffs await a series of decisions by the I.C.C. "Whenever" soon becomes "never." This case has dragged on long enough without the railroads being able to collect their filed rate. We are not willing to countenance further delay.

For all of the reasons stated above, we hold that the District Court abused its discretion in staying execution of the judgment favoring the railroads. The court is hereby directed to enter all orders necessary to permit the railroads to collect on their judgment immediately.

*B. Prejudgment Interest*

The railroads are also entitled to prejudgment interest on the amounts to be collected. As we held in *Louisiana & Arkansas Railway v. Export Drum,* 359 F.2d 311 (5th Cir.1966):

> [I]n actions initiated in the federal district courts for undercharges on freight shipments, interest from the time the money is due ... is a *mandatory* element of the damages.

*Id.* at 317 (emphasis added). The interest will be set at a rate equal to the average yield of marketable securities of the United States Government having a duration of ninety days. Because there are several payments at issue in this case, the "average yield" is to be measured as of the date the first of those payments was due.

Both parties agree that if interest is required, ninety-day Treasury Bills provide the proper measure. This would not have been true when *Export Drum* was decided.

---

**16.** We do not suggest that San Antonio has acted in bad faith in withholding payments. We merely hold that those withholdings were contrary to the letter and spirit of the filed rate doctrine.

At that time we allowed state law to determine the rate of interest. *Id.* We noted, however, that both the Interstate Commerce Act and I.C.C. regulations were silent on the question of prejudgment interest. Therefore, we looked to state law "as a matter of convenience and practicality" and because state law provided the standard for *post* judgment interest (as awarded pursuant to 28 U.S.C. § 1961).

Since then, the commerce statute, I.C.C. regulations, and section 1961 have all been amended. The Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210 [hereinafter cited as the "4–R Act"], provides that a shipper in a reparations action is entitled to prejudgment interest "at a rate equal to the average yield (on the date the [rate] statement is filed[17]) of marketable securities of the United States Government having a duration of 90 days." 49 U.S.C. § 10707(d)(1). In addition, in 1980, the Staggers Rail Act, *supra,* added a "reverse refund" provision, allowing a carrier to recover damages plus prejudgment interest when the I.C.C. has wrongfully suspended a tariff.[18] This interest, too, is measured "at a rate equal to the average yield (on the date the statement is filed) of marketable securities of the United States Government having a duration of 90 days." 49 U.S.C. § 10707(d)(2).

Finally, in 1982, Congress amended the federal postjudgment interest statute, section 1961, to measure interest by one-year Treasury Bills. None of these statutes directly applies to the case at bar.[19] Nevertheless, they provide guidance as to federal policy and, at least in the Interstate Commerce area, define the ninety-day Treasury Bill as the most appropriate rate. In the interest of establishing "one rule of federal decisional law [and] ... as a matter of convenience and practicality," *Export*

*Drum,* 359 F.2d at 317, we adopt the ninety-day bill as the guiding standard in this case.

As mentioned, no party objects to that standard. They do disagree, however, over the appropriate *date* of the Treasury Bill. The railroads contend that since there were several payments, each due on a different date during the period June 1980—May 1981, we should apply a different rate to each. We should use the Treasury Bill rate in effect as of the date each payment was due. The railroads argue that this method would correct for fluctuations in the rate during the period and, therefore, better approximate the inflationary effects at that time. San Antonio, by contrast, argues for a single rate.

In the interest of uniformity and practicality, *see Export Drum,* we think the best approach is to determine how federal commerce law has treated similar situations. The analogy of the Staggers Act "reverse refund" provision is little help because it turns on the date that a "statement" (within the meaning of section 10707) is filed. No such statement is filed in the type of case we face here.

Therefore, the closest analogy is the treatment of reparations to shippers pursuant to the 4–R Act. In interpreting that statute, the I.C.C. has measured prejudgment interest by the Treasury Bill rate in effect on "the date the *first* allegedly unlawful charge is paid." *Revised Procedures to Calculate Interest Rates,* 42 Fed. Reg. 20701 (April 21, 1977) (emphasis added). One rate applies even though the shipper has made subsequent payments at the unlawful rate. *See Kansas City Power and Light v. Kansas City Southern Railway,* 361 I.C.C. 848, 855 (1979).

In line with this practice, we hold that where a *carrier* is suing to recover for a series of underpayments, one interest rate

---

**17.** The I.C.C. subsequently clarified that the rate would be measured as of "the date that the first allegedly unlawful charge is paid." *Revised Procedures to Calculate Interest Rates,* 42 Fed.Reg. 20701 (April 21, 1977).

**18.** This particular provision does not directly apply "where, as here, a *court* [rather than the Commission] has prevented the carrier from collecting a higher tariff." *Burlington Northern v. United States,* 103 S.Ct. at 521 n. 6.

**19.** *See supra* note 18.

applies and is determined as of the date the first payment is due.[20] This approach may not result in a perfect measure of inflation, but it accords with analogous federal law and is somewhat simpler than the railroads' shifting rate approach. Above all, our approach helps to produce a uniform, coherent practice in the area of railroad rates.[21]

### CONCLUSION

To summarize briefly, the District Court abused its discretion in granting a stay which prevents the railroads from collecting their tariff rate immediately. We grant the mandamus, instructing the court to enter all orders necessary to secure enforcement of the railroads' judgment. In addition, the court shall award interest in accordance with this opinion.[22]

APPEALS DISMISSED. MANDAMUS GRANTED. MANDATE TO ISSUE FORTHWITH.

---

**20.** The date that payment is due is the time chosen because that is when the carrier begins to suffer harm and when prejudgment interest begins to accumulate. *See Export Drum,* 359 F.2d at 317.

**21.** In general, assuming that we cannot predict whether Treasury Bill rates will rise or fall, our single-rate approach does not appear to favor either shippers or carriers as a class.

**22.** Our opinion does not disturb the status of the city's counterclaims. We leave those open for further adjudication by the district court. *See supra* note 11.