878 F.2d 686
 14 Fed.R.Serv.3d 868
 The CHESAPEAKE AND OHIO RAILWAY COMPANY
v.
UNITED STATES STEEL CORPORATION, USS Corporation, USS
Division (formerly United States Steel
Corporation), Appellant in 88-3775
UNITED STATES STEEL CORPORATION
v.
Robert W. BLANCHETTE, Richard C. Bond and John H. MacArthur,
Trustees of the Property of the Penn Central Transportation
Company; the Penn Central Transportation Rail Corporation;
the Norfolk and Western Railway Company, USS Corporation,
USS Division (formerly United States Steel Corporation),
Appellant in 88-3776
UNITED STATES STEEL CORPORATION
v.
Robert W. BLANCHETTE, Richard C. Bond and John H. MacArthur,
Trustees of the Property of the Penn Central Transportation
Company; the Penn Central Transportation Rail Corporation;
the Norfolk and Western Railway Company, Norfolk and Western
Railway Company, Appellant in 88-3803
The CHESAPEAKE AND OHIO RAILWAY COMPANY, Appellant in 88-3804
v.
UNITED STATES STEEL CORPORATION
 Nos. 88-3775, 88-3776, 88-3803 and 88-3804.
 United States Court of Appeals,
Third Circuit.
 Argued April 25, 1989.
Decided June 20, 1989.
 
 Richard J. Munsch (argued), Pittsburgh, Pa., for USS Corp., USS Div.
 David P. Helwig (argued), Gary F. Sharlock, Sharlock, Repcheck & Mahler, Pittsburgh, Pa., for The Chesapeake and Ohio Ry. Co.
 Richard W. Kienle (argued), Roanoke, Va., for Norfolk and Western Ry. Co.
 Before HIGGINBOTHAM, STAPLETON, and WEIS, Circuit Judges
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this suit for the refund of freight payments, the district court decided that the shipper's claims fell within the statutory definition of "overcharges," and that the appropriate statute of limitations had not expired. We agree and will affirm the judgments in favor of the shipper. The district court further held that, in balancing the equities, prejudgment interest would be allowed only for a very limited period of time. We conclude that in these circumstances an award of prejudgment interest is not discretionary, but is mandated. As to this portion of the judgment, therefore, we will reverse and remand for the addition of prejudgment interest from the date the claims accrued, calculated in accordance with the practice of the Interstate Commerce Commission.
 
 
 2
 The district court entered summary judgment for United States Steel Corporation on its counterclaim against the Chesapeake & Ohio Railway Company, and for United States Steel in its separate suit against the Norfolk & Western Railway. In both instances the court sharply limited the award of prejudgment interest. All parties have appealed.
 
 
 3
 For twenty years before 1975, USS[1] claimed and received refunds from the railroads on coal shipments to its steel plant in Steelton, Duluth, Minnesota. In 1975, the United States brought suit against USS alleging that its receipt of these refunds violated the Elkins-Hepburn Act, 49 U.S.C. Sec. 11902. Because that statute made it illegal for any person to give or receive an unlawful refund, USS refused to cash the refund checks then in its possession, and the railroads made no further transmittals.
 
 
 4
 In March 1976, the Chesapeake & Ohio Railroad Company filed suit in the United States District Court for the Western District of Pennsylvania for the return of previously paid refunds. USS counterclaimed in November 1977 for additional refunds it asserted were due. Because at that time the Elkins Act case was still pending, C & O and USS agreed on a stipulation to control the processing of future refunds. If the government's case determined that the refunds were proper, C & O agreed that its suit would be "dismissed with prejudice." In the meantime, claims for refunds that had already been presented by USS "shall be denied without prejudice," and further refunds claimed by USS during the course of the proceedings "shall be denied by the C & O at the time of filing without prejudice."
 
 
 5
 In December 1977, USS filed a complaint against the Norfolk & Western Railway for refunds allegedly withheld improperly.[2] As in the C & O case, the parties stipulated that refund claims filed by USS during the course of the N & W suit "shall be denied by the defendant at the time of filing without prejudice." By joint motion, all further proceedings in both the C & O and N & W cases were stayed pending resolution of the government's suit.
 
 
 6
 In 1980, the district court in Minnesota granted summary judgment for the government in the Elkins Act suit, and USS appealed. The Court of Appeals vacated and remanded with directions that the controversy be referred to the Interstate Commerce Commission as a matter within the agency's primary jurisdiction. United States v. United States Steel Corporation, 645 F.2d 1285, 1291-94 (8th Cir.1981). The Commission ultimately declared that the refunds were proper, and in January 1987 the government dismissed the Minnesota case.
 
 
 7
 On termination of the Elkins Act suit, the Pennsylvania district court reopened the C & O and N & W cases. After a bench trial, the court concluded that USS sought recovery for overcharges, and therefore, that a three-year statute of limitations governed. The court rejected the railroads' contentions that the pleadings and stipulations acted as written disallowances of the refund claims that terminated the statutory tolling period; accordingly, none of the USS claims was barred. Judgments were entered in the principal amounts of $494,538 against C & O and $355,483 against N & W. The court allowed prejudgment interest, but only from January 5, 1987--the day the government dismissed the Elkins Act case.
 
 
 8
 On appeal, USS asserts a right to prejudgment interest from the dates the overcharge claims accrued. Additionally, USS contends that the appropriate method for calculating the interest due should be the average of the rates the government set for 90-day treasury bills between the years 1974 and 1987. The railroads appeal from the district court's refusal to deny certain claims as barred by the statute of limitations. Because this latter contention implicates the threshold issue of liability, we turn first to the railroads' appeal.
 
 I.
 THE STATUTE OF LIMITATIONS
 
 9
 The railroads argue that a substantial portion of the USS claims are time-barred. They advance two theories in support of that position--first, that the USS claims are governed by a two-year statute of limitations, and in the alternative, even if the longer limitations period is applied, that the statutory tolling period has expired.
 
 
 10
 The Interstate Commerce Act provides that actions to recover "damages not based on overcharges" must be filed within two years after the cause of action accrues. 49 U.S.C. Sec. 16(3)(b); 49 U.S.C. Sec. 11706(c)(1).[3] In contrast, actions to recover "overcharges" must be filed within three years of accrual. If, however, an overcharge claim is presented in writing to the carrier within the three year period, the limitations time extends for six months after "notice in writing is given by the carrier to the claimant of disallowance of the claim." 49 U.S.C. Sec. 16(3)(c). See 49 U.S.C. Sec. 11706(d).
 
 
 11
 The original statutory definition of overcharges was found in section 16(3)(g): "The term 'overcharges' ... shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs...." 49 U.S.C. Sec. 16(3)(g) (repealed). The successor statute enacted in 1978 defines overcharges as "amounts charged that exceed the applicable rate for transportation or service contained in a tariff." 49 U.S.C. Sec. 11705(b)(1).[4] At least as they apply to the circumstances of this case, these two versions are functionally identical. Indeed, Congress expressly stated that the recodification "may not be construed as making a substantive change in the laws replaced." Pub.L. No. 95-473, Sec. 3, 92 Stat. 1337, 1466 (1978). We conclude, therefore, that the 1978 recodification did not effect any change in the treatment of claims accruing thereafter.
 
 
 12
 To better understand the import of the parties' dispute on the overcharge definition, a brief summary of the underlying facts is helpful. USS operated a steelmaking facility in Steelton, Minnesota, importing coal from mines in the east. The coal was transported to the Steelton facility over a three-leg route: (1) by rail over the C & O and the N & W railways from the mines to the port at Toledo, Ohio; (2) by steamer across Lake Erie to Duluth; and (3) by rail over the Duluth, Missabe & Iron Range Railway from Duluth to the USS plant.
 
 
 13
 Following the published tariff approved by the Interstate Commerce Commission, USS paid the railroads for the first leg of this journey at a higher freight charge, but became entitled to receive refunds if, within two years, the coal moved by rail from Duluth to "an interior destination." From 1955 through 1979, USS had characterized the trip from the Duluth port to the USS plant as service to "an interior destination" within the meaning of the tariff, even though the DM & IR Railway was a USS wholly-owned subsidiary.
 
 
 14
 The railroads argue that the charges they originally assessed for carriage to the port at Lake Erie constituted the applicable fees for that service. Consequently, because they had not charged amounts that exceeded the applicable tariff rate, the railroads insist that USS can make no claim for "overcharges." In their view, the fact that USS later became entitled to a tariff refund when it reshipped the coal to an "interior destination" did not transform the original charge into an excessive one.
 
 
 15
 The railroads rely principally on Stott Briquet Co. v. New York Cent. R.R., 92 F.Supp. 115 (N.D.Ohio 1950). In that case, the court remarked briefly that a refund of the difference between the higher, non-reshipped coal rate and the lower, interior destination rate could not be characterized as a recovery of an overcharge. Id. at 118. The district court did not explain its reasoning or cite any authority for its conclusion, and we find its comment unconvincing.
 
 
 16
 The Court of Appeals in ALCOA v. United States, 867 F.2d 1448, 1452 (D.C.Cir.1989), distinguished between "overcharges"--rates exceeding the amounts specified in the applicable tariff--and "damages" for rates collected pursuant to unlawful tariffs. See Davis v. Portland Seed Co., 264 U.S. 403, 420, 44 S.Ct. 380, 383, 60 L.Ed. 762 (1924); Alabama Power Co. v. ICC, 852 F.2d 1361, 1372 n. 19 (D.C.Cir.1988). See also ICC v. American Trucking Ass'n, 467 U.S. 354, 358, 104 S.Ct. 2458, 2461, 81 L.Ed.2d 282 (1984). That distinction is useful here.
 
 
 17
 The disputed charges in the case at hand were not based on an unlawful tariff, but on one published and filed with the ICC. Neither were the charges set at an inapplicable level. When the coal was first shipped, the higher rate was the one provided for under the published tariff schedule. Thus, these circumstances do not fit within the definition of "damages" as that term is generally understood in a rate case.
 
 
 18
 We concur with the district judge that the USS refund requests are more properly characterized as overcharge claims. Once USS reshipped its coal to the Steelton plant, the lower interior destination tariff, also a legal one, became applicable.
 
 
 19
 This result--an adjusting "applicable" tariff rate--has been recognized by the courts. In Arkansas Oak Flooring Co. v. Louisiana & Arkansas Ry., 166 F.2d 98 (5th Cir.), cert. denied, 334 U.S. 828, 68 S.Ct. 1338, 92 L.Ed. 1756 (1948), the Court acknowledged that the applicable transportation rate can change with the occurrence of a later event specified by the tariff. Functioning in the reverse of the practice at issue here, the tariff in that case originally assessed a lower rate but provided for the collection of a higher charge if, within one year, the goods were not transshipped. If no timely reshipment was made, the Court wrote, "the [lower] transit rate ceased to apply, and the [higher] local rate became applicable." Id. at 100. Cf. Bethlehem Steel Co. v. Consolidated Rail Corp., 515 F.Supp. 472, 474 (E.D.Pa.1981) (higher transit charges did not become overcharges until the transit period expired).
 
 
 20
 Because the applicable rate for the transit services in dispute here was reduced when USS reshipped its coal to its Steelton plant, the refund demands were claims for overcharges. Consequently, the three-year statute of limitations applies.
 
 
 21
 This determination does not, however, conclude our inquiry. The railroads argue that they disallowed the USS claims in writing as the tolling provision of the three-year limitations provision requires, 49 U.S.C. Sec. 16(3)(c), but that USS failed to preserve its overcharge claims by suing within six months of the notice of disallowance.
 
 
 22
 C & O argues that its complaint filed in the district court in 1976 served as a written notice of disallowance. Further, both railroads assert that their stipulations with USS, which provided that "all refunds claims ... shall be denied at the time of filing without prejudice" for the duration of the Elkins Act litigation, also acted as notices of disallowance. We are persuaded that these writings did not serve as notices within the meaning of section 16(3)(c).
 
 
 23
 To be effective, a notice of disallowance must convey the idea of denial of the carrier's liability. Under the three-year limitations statute, the tolling period will not expire until six months after the claims have been finally declined by the carrier. Cf. Cordingley v. Allied Van Lines, 563 F.2d 960, 964 (9th Cir.1977) (carrier's notice of disallowance must be clear, final, and unequivocal to have effect under 49 U.S.C. Sec. 20(11)); Polaroid Corp. v. Hermann Forwarding Co., 541 F.2d 1007, 1011-12 (3d Cir.1976) (same).
 
 
 24
 That the C & O intended its complaint to give the impression of a final declination is belied by the stipulation's concession that the railroad would dismiss the action with prejudice in the event the Elkins Act suit was resolved in USS's favor. Moreover, by its terms, the complaint sought only the recovery of refunds already paid; it did not request declaratory relief that future refunds were unlawful.
 
 
 25
 Nor do the stipulations amount to final declinations. Although both state that the refund claims are to be "denied ... at the time of filing," thus suggesting formal refusal, the stipulations add the qualification that the denials are "without prejudice." This apparent contradiction marks the stipulations as ambiguous.
 
 
 26
 As with any contractual agreement, when the terms of a stipulation are ambiguous, we look to the parties' intent and make every effort to give effect to that expectation. United States v. Reading Co., 289 F.2d 7, 9 (3d Cir.1961). We have no trouble divining that each of the parties here was anxious to avoid the liability that would have resulted had the government prevailed in the Elkins Act litigation. Both the railroads and the shipper realized, however, that their business relationship had to continue during the period of uncertainty that would ensue until the legality of the refunds was finally determined.
 
 
 27
 A common sense solution to this dilemma was an agreement to suspend consideration of refund claims until the Elkins Act case could be resolved. That such was the intention of the parties here is demonstrated by their conduct. As they accrued, USS filed with the railroads written claims containing the notation, "I understand that it is your company's position that it will not honor our claims for refunds on movements to our Duluth works pending the outcome of that litigation." In response, the railroads sent postcards merely "acknowledg[ing] receipt of your claim," without ever stating a forthright denial. We are satisfied that a simple suspension of refund processing was the intent of the parties, and that no final notice of disallowance was contemplated by the stipulations.
 
 
 28
 We accept, as an alternate basis for rejecting the limitations defense, the applicability to this case of the relation-back provision in the Federal Rules. See Fed.R.Civ.P. 15(c). Where, as here, the original pleading placed the defendant on notice that the disputed conduct was of a continuing nature, the defendant is generally expected to defend against all claims arising out of that course of conduct--whether accruing before or after the original pleading was filed. See 6 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1508, at 556 (1971). Because USS's original pleadings challenged the carriers' refusal to remit refunds for the overcharges, allegations made in the supplemental pleading addressing subsequent instances of the same, continuing conduct do not invoke a statute of limitations defense. See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1057 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982).
 
 
 29
 For each of these reasons, we accept the district court's determination that the statute of limitations does not bar USS's recovery of its overcharge claims. The district court's ruling on the railroads' appeal will be affirmed.
 
 II.
 PREJUDGMENT INTEREST
 
 30
 The district court concluded that an award of prejudgment interest in this case would be inequitable because USS had consented to the suspension of refunds rather than insisting on the payments as they came due. Believing itself free to exercise discretion on the issue, the court awarded prejudgment interest only from the date the Elkins Act suit was dismissed.
 
 
 31
 The district court's decision to balance the equities was inconsistent with the parties' stipulation to voluntarily stay further proceedings pending the outcome of the Elkins Act case. The parties realized that this arrangement would delay the payment of any refunds ultimately found to be owing, but each agreed, in accordance with its own best interests, to suspend adjustment of the claims. Consequently, neither party enjoyed any superior claim to receive or deny prejudgment interest based on the length of time that elapsed.
 
 
 32
 Even were we to accept the assertion that USS's agreement to suspend the processing of its claims tipped the equities in favor of the railroads, we would still be compelled to hold that the obligation to pay prejudgment interest on those claims remained undiminished.
 
 
 33
 The railroads defend the district court's exercise of discretion in awarding prejudgment interest by citing two of our opinions, Ambromovage v. United Mine Workers of America, 726 F.2d 972, 981 (3d Cir.1984) and Thomas v. Duralite Co., 524 F.2d 577, 589 (3d Cir.1975). The literal holding in those two cases was urged upon us and rejected in Consolidated Rail Corp. v. CertainTeed Corp., 835 F.2d 474 (3d Cir.1987). In that case, we directed the award of prejudgment interest to a carrier in connection with its claims for undercharges. We pointed out that in the Interstate Commerce Act setting, Ambromovage and Duralite--both of which had arisen in entirely different, state law circumstances--were "not helpful." Id. at 479.
 
 
 34
 We emphasized in CertainTeed the Interstate Commerce Act's policy that shippers be treated uniformly and that opportunities for favoritism be foreclosed. Such a policy, we held, implied full payment of tariff charges. "Waiver of prejudgment interest would confer on those who delay payment of the balance due an advantage over shippers who meet their obligations promptly." Id. at 478. This expressly reaffirmed our earlier conclusion in Southern Pac. Co. v. Miller Abattoir Co., 454 F.2d 357, 362 (3d Cir.1972), that: "To allow the Railroad to recover without awarding prejudgment interest would be to diminish the tariff charge by an amount representing the value of the use of the money owed for the period prior to judgment." Id. at 362.
 
 
 35
 Those same considerations apply here. To permit payment of only the face amount of the overcharges, without accounting for the use of the money during the period before reimbursement, would confer on the carriers a benefit to which they are not entitled under the applicable tariffs. As we held in CertainTeed and Miller Abattoir, prejudgment interest in cases of this nature is not discretionary--it is required. See Pennsylvania R.R. v. Minds, 250 U.S. 368, 370-71, 39 S.Ct. 531, 531, 63 L.Ed. 1039 (1919); Arkadelphia Milling Co. v. St. Louis Southwestern Ry., 249 U.S. 134, 147, 39 S.Ct. 237, 242, 63 L.Ed. 517 (1919); Garrett v. Time-D.C., Inc., 502 F.2d 627, 629-30 (9th Cir.1974), cert. denied, 421 U.S. 913, 95 S.Ct. 1569, 43 L.Ed.2d 778 (1975); Louisiana & Arkansas Ry. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir.1966); Fawley Motor Lines v. Cavalier Poultry Corp., 235 F.2d 416, 419 (4th Cir.1956). The fact that the government's litigation prolonged the prejudgment period in this case does not justify our departure from the Congressional policy implicit in the Interstate Commerce Act. Prejudgment interest, therefore, must be assessed.
 
 
 36
 Anticipating that we might well differ with the district court on the prejudgment interest issue, the parties have suggested various interest formulations. USS urges that the Court compute and apply the average rate of 90-day treasury bills over the entire period of delay--the average of some twelve years of treasury bill rates. The railroads argue for the application of a single rate of interest calculated in the same manner as in ICC administrative proceedings. Before February 5, 1976, the ICC imposed a standard 4% rate of prejudgment interest in such proceedings; after that date, the Commission applied the rate of the 90-day treasury bill in effect at the time of the first improper charge. 49 C.F.R. Sec. 1141.1 (1988).[5]
 
 
 37
 The appropriate rate of prejudgment interest in a case such as this has been the subject of careful review by two of our sister Courts of Appeals. Both have accepted the formula used by the ICC in parallel procedures before that agency. In Southern Pac. Transp. Co. v. San Antonio, 748 F.2d 266, 275 (5th Cir.1984), the Court gave special weight to "the interest of establishing 'one rule of federal decisional law' " and the concerns of "convenience and practicality." There, the carriers recovered a series of underpayments and argued that the rate of interest should vary with each claim. The Court rejected this approach, applying a single, uniform interest rate determined as of the date the first payment was due. Although conceding that such a calculation might not replicate a perfect measure of inflation, the Court embraced the single rate formulation as simple and in accordance with analogous federal law. "Above all, our approach helps to produce a uniform, coherent practice in the area of railroad rates." Id. at 276.
 
 
 38
 Likewise, in Farmers Export Co. v. United States, 758 F.2d 733, 737 (D.C.Cir.1985), the Court of Appeals agreed that the Commission need not apply a fluctuating rate of prejudgment interest, commenting that the single rate rule had been established "as the most equitable for both parties." Analogizing the Commission's formula to a fixed rate loan, the Court reasoned that the "fact that there is some risk, just as there would be on an actual bank loan, does not invalidate the Commission's practice." Id. at 738.
 
 
 39
 We agree completely with the overriding importance these two decisions placed on national uniformity and simplicity of application. Although a fluctuating rate arguably might be more equitable, we are not prepared to accept this consideration as so strong as to justify a break with the settled policy established by two other Courts of Appeals and the Interstate Commerce Commission.
 
 
 40
 There is, however, a complicating factor here that was not present in either the San Antonio or Farmers Export decisions. In this case, the first overcharge claims arose before February 5, 1976--the date on which the Commission promulgated its 90-day treasury bill rate regulation. Before that date, the Commission had used a standard 4% interest rate, without regard to prevailing market conditions. See Farmers Export Co., 758 F.2d at 738; Christensen Bros. Feed Co. v. Great Northern Ry., 303 I.C.C. 45, 46 (1958).
 
 
 41
 Although prejudgment interest in cases such as these begins to accumulate when the claim accrues, the Commission's regulation does not specify whether the new 90-day bill rate is to be applied retroactively. The railroads assert that the ICC's practice of applying a fixed 4% rate should govern all pre-February 1976 claims, with the 90-day treasury bill rate being applied thereafter.
 
 
 42
 Although credible arguments may be made for both positions, we are convinced that the interest of uniformity outweighs other considerations. Finding no appellate decisions to counsel us otherwise, we choose to follow the practice of the ICC.
 
 
 43
 In its notice of revised procedures to calculate interest, the Commission announced that the 90-day treasury bill rate formula "shall apply to all awards of interest ... from the date of service of this Notice." 42 Fed.Reg. 20701 (Apr. 21, 1977). Phrased another way, the Commission decided that whether its old fixed rate or the new treasury bill formulation applied in any given case would depend not on the date the claim accrued, but on the date the award was made. Agency decisions reveal that the Commission follows this interpretation in its own administrative proceedings. See Ross Indus. v. Atchison, Topeka & Sante Fe Ry., 356 I.C.C. 870, 873 n. 1 (1977) (interest on 1977 reparations award calculated by treasury bill rate even though claims based on events which occurred in 1975); Administrator of General Services v. Burlington Northern, Inc., 357 I.C.C. 232, 243 (1977) (award for overcharges occurring before 1976 increased by prejudgment interest calculated under variable treasury bill rate formula encompassing date that first unlawful charge was paid).
 
 
 44
 We conclude that the 90-day treasury bill rate formulation should be applied to calculate the prejudgment interest due on USS's overcharge claims. The pertinent treasury bill rate shall be the one in effect for the date on which the first unlawful charge occurred. Because USS asserts claims against two different defendants in two separate suits, the interest rate to be applied in each suit may differ depending on the treasury bill rate in force on the date the first claim against each defendant accrued. We will not attempt to defend that disparity here, except to acknowledge that in arbitrary classification procedures, individual inequities will appear that must be endured as the costs of administrative practicality.
 
 III.
 
 45
 The judgment of the district court will be vacated insofar as it did not allow prejudgment interest from the date the claims accrued. The case will be remanded for addition of prejudgment interest calculated by the average yield of marketable securities of the United States government having a duration of ninety days, with the rate pertinent to each defendant ascertained as of the date the first overcharge was paid to each defendant. In all other respects, the judgment of the district court will be affirmed.
 
 
 
 [1]
 At the time these events began, the shipper was the United States Steel Corporation. It was later reorganized and is presently known as USX. For ease of reference throughout the opinion, we will use "USS."
 
 
 [2]
 Penn Central and Conrail were also named as defendants. They settled their claims and are no longer parties to this litigation
 
 
 [3]
 Section 16(3) of the Act was repealed effective October 17, 1978 and replaced with 49 U.S.C. Sec. 11706
 
 
 [4]
 This definition is not found in the revised limitations provision, 49 U.S.C. Sec. 11706, but in an accompanying section, 49 U.S.C. Sec. 11705(b)(1), to which the limitations provision refers
 
 
 [5]
 This method of calculating interest due was adopted by Congress in the 1978 codification of the Interstate Commerce Act. See 49 U.S.C. Sec. 10707(d)(1)